(Nos. 20779-86 incl. and 20836.—
THE UNION TRUST COMPANY *et al.* Appellants, *vs.* THE
BOARD OF EDUCATION OF THE CITY OF CHICAGO, Appellee.

*Opinion filed April 23, 1932.*

Dunn and DeYoung, JJ., dissenting.

Shannon & Morrill, Schuyler, Dunbar & Wein-
feld, Winston, Strawn & Shaw, Sonnenschein, Berk-
son, Lautmann, Levinson & Morse, Ryan, Condon &
Livingston, and Butler, Pope, Ballard & Elting,
(Angus Roy Shannon, W. C. Graves, Duane T. Mc-
Nabb, Irvin I. Livingston, Allan J. Carter, and Isaac
E. Ferguson, of counsel,) for appellants.

Thomas V. Sullivan, and Frank S. Righeimer,
(Edward R. Johnston, of counsel,) for appellee.

Mr. Justice Orr delivered the opinion of the court:

Nine cases have been consolidated in this appeal, all be-
ing actions in equity to enjoin the board of education of
the city of Chicago from enforcing the 1925 appraisement
of school land, on the ground that the appraisals were not
made in accordance with the terms of the original and sup-
plemental leases. Substantially the same allegations are con-
tained in each of the nine bills of complaint, and the answers

filed to each by appellee were in substance the same. Seven of these appeals involve leaseholds in the block bounded by State, Madison, Dearborn and Monroe streets, in the heart of Chicago's main retail business district; another involves a lot on Jackson boulevard, across the street (south) from the Union Station; and another involves a number of lots on the east side of Halsted street between Madison and Monroe streets. Appellants are the lessees, or assignees of lessees, under leases originally made in 1880, each for a term of fifty years. All the leases and supplemental leases are identical in form. The leases of 1880 provided that for the purpose of ascertaining the rent to be paid an appraisement should be made each five years, beginning May 8, 1885, by three appraisers to be appointed by the board of education. These appraisers were to determine the true cash value of the premises at the time of such appraisal, not taking into consideration the improvements thereon. The appraisals of 1885 were not satisfactory to the lessees, who filed a bill in the superior court of Cook county to enjoin their enforcement. After litigation lasting some years a compromise was effected which resulted in the execution of the supplemental leases of 1888. By these supplemental leases the revaluation period was changed from five to ten years and the time when the leases were to expire was extended ninety-seven years, to May 8, 1985. All leases and supplemental leases are identical in form. As a result of these supplemental leases of 1888 appraisals were made in 1895, 1905, 1915 and 1925. Drastic advances in rentals were required by the 1925 appraisals. For instance, lots 9, 10 and 11 in block 142, on which is situated the McVicker Theater building, were increased in value from $1,100,226.24 in 1915 to $2,330,720 in 1925. The rentals were fixed at six per cent of the land values, and this increase had the effect on the property described of raising the annual rent from $60,-073.57 to $122,023.20 per year. Objections were filed to the report of the appraisers in 1925 and each of the lessees

tendered rent due on the basis of the 1915 appraisal, claiming that in default of a valid 1925 appraisal the rent due for the ensuing period remained unchanged. These tenders were refused by the board of education and notices of forfeiture in case of non-payment of the rent, together with demand for twenty-five per cent penalty, were served on appellants. On July 27, 1925, the bills of complaint in these cases were filed in the superior court of Cook county, and preliminary injunctions were granted restraining the board of education from attempting to collect any greater sum as rent for the several leaseholds than the quarterly rent due under the 1915 appraisal, and providing further that none of the rights of any of the parties would in any manner be waived or prejudiced either by the payment or acceptance of rent at the 1915 rate during the pendency of these cases. The nine cases were heard together by a master in chancery, who recommended that a decree be entered upholding the validity of the 1925 appraisal but without enforcing the twenty-five per cent penalty of additional rent or the cancellation or forfeiture of the leases. Objections were filed to the master's report, which stood as exceptions before the chancellor. These exceptions were overruled and decrees were entered by the court in conformity with the master's conclusions and recommendations. It was from these decrees that the present appeals were taken.

In behalf of the appellant lessees it is first urged that the 1925 appraisal is void because Paul Steinbrecher, one of the three appraisers, was appointed by three judges holding the District Court of the United States for the Northern District of Illinois for the time being and not by "any judge holding the Circuit Court of the United States" for such district. The fourth provision of the supplemental lease of 1888 provided the method of appointing appraisers, as follows: "The board of education of the city of Chicago, any judge holding the Circuit Court of the United States in and for the Northern District of Illinois for the time being, and

the judge of the probate court of Cook county, Illinois, or the successor of said court having probate jurisdiction, for the time being, shall each appoint one discreet male resident of the city of Chicago not interested as lessee or mortgagee of school property in said city, to determine, under oath first duly taken, the true cash value of said demised land at the time of such appraisal, exclusive of the improvements thereon." Twenty-three years after these supplemental leases of 1888 were made, Circuit Courts of the United States were abolished by an act of Congress of March 3, 1911. (Judicial Code, chap. 13, secs. 289-291, 28 U. S. C. A.) By section 291 of this act the powers and duties of the Circuit Courts were conferred upon District Courts in the following language: "Wherever, in any law not embraced within this act, any reference is made to, or any power or duty is conferred or imposed upon, the Circuit Courts, such reference shall, upon the taking effect of this act, be deemed and held to refer to, and to confer such power and impose such duty upon, the District Courts." The act of March 3, 1911, did not abolish the jurisdiction or restrict the powers formerly existing in the Circuit Courts. It merely conferred the powers, jurisdiction and functions of that court upon the District Court. As stated by the Supreme Court of the United States in the case of *Ex parte United States,* 226 U. S. 420, 423: "It is also undoubted that by that act the District Courts provided for were made the successors of both the Circuit and District Courts which had theretofore existed and were in a general sense endowed with the jurisdiction and power theretofore vested in such prior courts." In the case of *Nashville Interurban Railway Co.* v. *Barnum,* 212 Fed. 634, the Circuit Court of Appeals for the Second Circuit gave this same interpretation to the act. There the court was called upon to consider the effect of a trial in the District Court of the United States where a jury was waived after the effective date of sections 289-291 of the Judicial Code. The District Courts originally had no juris-

diction of such cases. The Circuit Courts had such jurisdiction, and the Circuit Court of Appeals held that these enlarged powers passed to the District Court, in the following language: "Although in form the Judicial Code abolished the Circuit Courts and turned their business over to the District Courts, it seems to us that what Congress intended was a merger of the Circuit Courts into the District Courts, and that in transferring to the District Courts the business of the Circuit Courts there was given to the District Courts, under the section of the Judicial Code above quoted, all the machinery for disposing of its business which the Circuit Courts possessed. We are unable to understand that section in any other way. It is also illuminative of this intent that Congress did not repeal the particular section which provided for trial by the Circuit Courts under written stipulation. If the intention had been that thereafter all cases tried in the District Courts, whether original or transferred, should be tried only under the old District Court system, the section became obsolete and was without any reason for its retention. We are therefore forced to the conclusion that the present case must be treated by us precisely as it would have been treated had the trial taken place in the old Circuit Court under the practice which Congress had once approved for that court and which it has never disapproved."

It will thus be seen that after January 1, 1912, when the act creating the District Court became effective, a Federal court was in existence which possessed all of the jurisdiction and powers of the Circuit Court, with such added powers as were formerly exercised by the District Court alone. The only differences after January 1, 1912, were, that the name of the court was changed from "circuit" to "district" and its powers enlarged. The reference in the supplemental leases to the appointment of one of the three appraisers by "any judge holding the Circuit Court of the United States for the Northern District of Illinois for the time being" was only for the purpose of identifying the individuals who

were to be the donees of the appointive power. The change in the name of the court and in its powers is not a material change so far as the purposes which the parties to the supplemental leases had in mind. They wanted the power to appoint the appraisers to be permanently vested in individuals of a certain type and class in order to insure the appointment of competent, impartial and disinterested appraisers. The purely technical change in the name of the court from "circuit" to "district" and the enlargement of its powers cannot defeat the purposes of the parties to the leases and render one of its controlling provisions nugatory. (*Worthington* v. *Hewes & McCann,* 19 Ohio St. 66; *New York Central Railroad Co.* v. *Saratoga and Schenectady Railroad Co.* 39 Barb. (N. Y.) 289; 19 Corpus Juris, 968.) A change in the name of the court is a mere matter of form and is wholly unimportant so far as section 4 of each supplemental lease is concerned, provided that court can be clearly identified. Since the judges holding the District Court are vested with all the jurisdiction, perform all the duties and exercise all the powers formerly exercised by the judges holding the Circuit Court, there can be no question about the identity of the jurisdiction intended. It therefore cannot be said that even the secondary purpose of section 4 has failed, much less the primary purposes.

The supplemental leases of June 15, 1888, were expressly drawn for the purpose of preventing further litigation and settling for the term of the leases the method of selecting impartial appraisers. The leases recite the disputes existing between the lessees and the board of education, and state that "for the purpose of settling all matters in dispute" the parties have entered into the supplemental indentures. It is therefore obvious that the parties primarily intended to provide a method of selecting fair and impartial appraisers which would never fail so long as the leases were in existence. By placing the appointive power of two out of the three appraisers in the hands of judges rep-

resenting the Federal and State judiciary, it is evident that they intended to select a class of men as donees of the appointive power who would be impartial, of recognized standing and ability and available throughout the entire term of the leases. They were not interested in the jurisdiction or judicial powers of the judges as such, for they were not involved in any court procedure or litigation. Contracts involving the rental of school lands vitally affect the public interest and are to be construed liberally in favor of the public. (*Joy* v. *St. Louis,* 138 U. S. 1; Williston on Contracts, (2d ed.) sec. 626, p. 1210; *Omaha Water Co.* v. *City of Omaha,* 162 Fed. 225.) These are suits in equity, and no such literal construction of the leases should be adopted as would cause a forfeiture of valuable property rights where a fair and reasonable construction makes performance possible and avoids a forfeiture. *Rankin* v. *Rankin,* 216 Ill. 132; *Forest City Ins. Co.* v. *Hardesty,* ·182 id. 39; 13 Corpus Juris, 541.

It is further urged by appellants that since all three district judges concurred in Steinbrecher's appointment the appraisal is invalid. Whether the three judges conferred together before making the appointment does not appear from the record. In any event, Steinbrecher was the choice of each of the three judges, for each of them signed the certificate of his appointment. He was just as clearly the individual appointment of Judge Carpenter, of Judge Wilkerson and of Judge Cliffe as if each of those judges had signed a separate certificate naming him as appraiser. The appellants fail to show any prejudice or injury to them because three qualified donees of the power to appoint agreed upon one individual as appraiser. Any one of these three district judges could have made a valid appointment. The most that can be said on this score is that there was an excess in the use of appointive power—something more than the leases required or contemplated. The principle is well settled that appointments made in substantial compli-

ance with the expressed purpose of the power, although not strictly in accordance therewith, are good appointments in equity. Farwell on Powers, (1916 ed.) p. 366; 22 Am. & Eng. Ency. of Law, p. 1151; *People* v. *Morgan,* 90 Ill. 558; *Butler* v. *Huestis,* 68 id. 594.

Coming, now, to the question of the appraisement itself, we find the appellants vigorously insisting that the 1925 appraisals are unlawful because they were founded upon an erroneous principle of valuation. The supplemental leases of 1888 provided for the payment of rent on the basis of six per cent of the land value, to be determined by "the true cash value of said demised land at the time of such appraisal, exclusive of the improvements thereon." Clause 6 of the supplemental leases of 1888 further provides: "Sixth— That notwithstanding anything in said lease contained, the appraisers shall be at liberty in forming their judgment of the value of the land without including the value of the improvements thereon, to take into consideration, if and so far as they deem it pertinent to do so, the improvements on such land, and the character, condition, value, cost, rental, expenses and other particulars thereof, and any other facts or information, from whatever source, bearing upon the question of the actual value of said land; and it shall be the duty of the lessee to furnish the appraisers promptly, on request, a statement showing the rental receipts and disbursements on account of said improvements for five years, as near as may be, next preceding the time of the appraisement." In *Sebree* v. *Board of Education,* 254 Ill. 438, this court, in construing this same clause in a similar lease, held that the appraisers there had the right to take into account the effect, if any, of the lease, with a ten-year re-valuation clause, upon the fair cash value of the land. This construction of clause 6 was also re-affirmed in *Rosenthal* v. *Board of Education,* 270 Ill. 380. In the consolidated cases here presented it appears from the record that the appraisers sought to offset the depreciation in value

resulting from the encumbrance of the re-valuation clause in the leases by substituting a countervailing factor that the land was tax exempt. While it is true that the land, so long as it remains school land, is tax exempt, this is not an advantage that can be passed along to anyone else who might choose to buy the land from the board of education. This tax-exempt feature, therefore, was not properly an element of market value. The express provisions of the sixth clause of the supplemental leases gave to the appraisers sufficient latitude to determine "the question of the actual value of said land." The appraisers were not to determine the rental value of the land but were to determine its true cash or market value, exclusive of improvements, at the time of such appraisal. After arriving at its true cash or market value the annual rental was to be determined on the basis of six per cent per annum of such valuations, which was a mere computation. The record shows conclusively that instead of proceeding to first ascertain the true cash market value of the land, the appraisers, using the tax-exempt feature, proceeded to fix valuations that at six per cent per annum would produce the rentals they thought the lessees ought to pay. An examination of the inquiries made of the different witnesses by the appraisers shows conclusively that the tax-exempt feature was one of the principal items they took into consideration in fixing the rental values of the land. From the method followed, it is evident that the appraisers estimated the amount of tax saving in each instance, then capitalized it at five per cent and increased the normal valuation of the land by the resulting total. It is obvious that such a method of valuation was erroneous. The only elements which could properly be considered under clause 6 of the supplemental leases were such as would affect the market value of the land. An exemption from taxation which could not be passed along by the board of education to an ordinary purchaser was not such an element. In taking into consideration the tax-

exempt feature of this school land the appraisers exceeded their authority and adopted an improper theory of valuation. While the record indicates that the appraisers acted in good faith and without taint of fraud, the appraisal was made excessive by the introduction of an improper element. The mistake was not one of mere judgment as to values but was due to the fallacy of attempting to value the land as tax exempt when, in fact, it would not be tax exempt if sold on the market. The fact that no ground taxes were payable by either the board of education or the lessees had nothing to do with the determination of the true cash value, or, what is synonymous, the fair cash market value of the land. The true cash or market value of the land is the same whether the land is owned by the board of education or by a private owner.

It is earnestly contended by appellee that even though the appraisers improperly considered the tax-exempt feature of the land in determining its true cash value, such a mistaken basis of valuation will not invalidate the appraisal. In other words, in the absence of fraud they contend that where the appraisers have confined themselves to the subject matter of their appraisal, and where the appraisement, as in this case, is exactly what the appraisers intended it to be, it is unimpeachable. Without considering the far-reaching effects of this doctrine, it may be said to be inapplicable here inasmuch as the appraisers failed to primarily confine themselves to the subject matter of their appraisal—*i. e.*, a determination first of the true cash value of the land, from which its rental value would automatically determine itself by the terms of the leases. The appraisal of 1925 is therefore invalid because it is founded upon a mistaken assumption of authority. The appraisers misconceived the subject matter of the appraisal, in that their inquiry was directed chiefly as to the rental value rather than the true cash, or market, value of the land. It has been repeatedly held that a mistake of appraisers in giving effect to an element of

value not within the scope of the appraisal nullifies the appraisal, since the result is an appraisal of a subject matter other than that submitted. *Snead & Co. Iron Works* v. *Trust Co.* 225 Ill. 442; *Sherfy* v. *Graham,* 72 id. 158; *Borrowe* v. *Milbank,* 5 Abbott's Pr. 28; *Sholz* v. *Mills,* 158 S. W. (Mo.) 696; *Low Estate Co.* v. *Lederer Realty Corp.* 35 R. I. 352, 86 Atl. 881; *Stowe* v. *Mutual Home Builders' Corp.* 252 Mich. 492, 233 N. W. 391; *St. Paul Fire and Marine Ins. Co.* v. *Eldracher,* 33 Fed. (2d series) 675; *Lee* v. *Providence-Washington Ins. Co.* 82 Mont. 264, 266 Pac. 640; *Bartlett* v. *Bartlett & Son Co.* 116 Wis. 450, 93 N. W. 473; *Bailey* v. *Triplett,* 83 W. Va. 169, 98 S. E. 166.

The eighth clause of the supplemental leases provides that if for any cause there is a failure in the making of an appraisement in any year or years when it should be made, the amount of annual rent to be paid for the ensuing period of ten years shall not be rendered uncertain by reason of such failure but shall be the same as that paid during the preceding period of ten years. This clause was obviously inserted to prevent the rent being rendered uncertain or undetermined by reason of the failure to make an appraisement. The test of whether the eighth clause becomes effective is whether an appraisement was made—not whether a correct or valid appraisal was arrived at. Here the appraisers were properly selected in 1925 and made an appraisal. The provisions of the eighth clause of the supplemental leases therefore do not become operative. It is not claimed by appellants that an appraisal was not made in 1925. Their sole contention, which we have sustained, is that the appraisal then made was invalid. The appraisers were not the agents of the board of education. The supplemental lease expressly declares that the appraisers shall not be the representatives of either of the parties. The improper element of value considered by the appraisers therefore cannot be charged to appellee. This is a suit in equity, and it would be inequitable that in such circumstances

the appellee should be deprived of all opportunity to establish the true cash value of the lands in 1925. There is legal precedent in this State for holding that where the appraisal provided for in a lease has failed without the negligence of the party complainant, courts, both of equity and law, will interfere to prevent a failure of justice by hearing evidence and making the appraisement themselves. Thus, in the case of *Springer* v. *Borden,* 154 Ill. 668, this court said: "The same question involved here arose in *Tobey Furniture Co.* v. *Rowe,* 18 Ill. App. 293, and it was there held that while a court of equity will not specifically enforce a contract for arbitration by compelling the appointment of arbitrators or by compelling them to act when appointed, yet where the rights of the parties are made to depend upon an appraisal of property and the appraisal provided for in the contract has failed, courts, both of equity and of law, will interfere to prevent a failure of justice by hearing the evidence and making the appraisement." This same doctrine has been adopted by the courts of other States: *Lehigh Valley Railroad Co.* v. *Andrus,* 112 Atl. (N. J.) 307; *Grosvenor* v. *Flint,* 20 R. I. 21, 37 Atl. 304; *Sherman* v. *Cobb,* 16 id. 82, 12 Atl. 232; *Holmes* v. *Shepherd,* 49 Mo. 600.

The 1925 appraisal being invalid it is not necessary for us to consider any of the other points raised by appellants.

The decree of the superior court of Cook county is affirmed as to the appointment and qualifications of the appraisers but in other respects is reversed because of the mistaken basis of appraisal, and the cause is remanded to that court, with directions there to hear evidence and determine the true cash value of the leased lands as of May 8, 1925.

*Reversed in part and remanded, with directions.*

JUSTICES DUNN and DEYOUNG, dissenting.