SUPERIOR INVESTMENT AND DEVELOPMENT CORPORATION, INC., *et al.*, Plaintiffs-Appellants, v. JAMES D. DEVINE *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—91—0611

Opinion filed March 31, 1993.

Grippo & Elden, of Chicago (Philip C. Stahl and Eric D. Brandfon-brener, of counsel), for appellants.

Feiwell & Galper, Ltd., of Chicago (Daniel C. Meenan, Jr., of counsel), for appellees.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

This case involves the interpretation of a shareholder agreement between plaintiffs, Bernard Katz and Benjamin Weiss, and defendants, James Devine and John Gross. Plaintiffs and defendants were joint owners in a real estate syndication and investment company. Devine and Gross subsequently resigned from the company to form a competing business, triggering a stock purchase agreement, wherein plaintiffs exercised their option to purchase defendants' shares of the company at fair market value. Following valuation by an independent accounting firm, defendants moved for judgment in their favor, based upon the independent appraisal. The trial court adopted the findings of the appraiser and granted summary judgment in favor of defendants. Plaintiffs appeal from this order based upon three alleged errors: (1) the appraiser's report applied a valuation method inconsistent with the terms of the stock purchase agreement; (2) the report is factually incorrect in that it takes into account future income streams from partnership agreements; and (3) the report was declared "null and void" by the appraiser and, therefore, cannot be a basis of the trial court's judgment.

For many years, Katz and Weiss had been jointly involved in construction and real estate development and syndication. In 1980, Katz and Weiss, together with Devine and Gross, formed Super Investment and Development Corporation, Inc. (SIDCOR). As originally structured, plaintiffs owned 2,500 shares of the 2,550 outstanding shares and defendants owned the remaining 50 shares. Plaintiffs then entered into a shareholder agreement (the Agreement), wherein control of the stock was evenly divided between Devine/Gross and Katz/Weiss, each pair receiving a 50% ownership of the stock. The Agreement also gave plaintiffs the option to purchase defendants' shares in the event they resigned from the company.

On April 15, 1989, Devine and Gross resigned from SIDCOR in order to engage in a business competitive with SIDCOR. Katz and Weiss then exercised their right to purchase the Devine/Gross shares. In ac-

cordance with the Agreement, Devine and Gross were entitled to the fair market value of their shares as of April 15, 1989, the date of their resignation. Because the parties were unable to agree on a fair market value of SIDCOR's assets, in order to determine a fair price for defendants' shares, plaintiffs filed suit seeking a declaratory judgment and other relief with respect to the valuation of SIDCOR.[1] Plaintiffs then moved the court to appoint an appraiser to value those specific assets on which the parties could not agree. Defendants, on the other hand, urged the court to appoint an appraiser to identify and value all assets of SIDCOR and to value SIDCOR as a going concern, rather than limit the authority of the appraiser to specific assets.

On February 1, 1990, the trial court found that the provisions of the Agreement governing asset valuation reflected an intent by the parties to value the stock at "fair market value" and further ordered a full-scale appraisal of SIDCOR as a going concern, rather than an asset-by-asset valuation. The trial court later appointed the independent accounting firm of Arthur Andersen & Company (Andersen) to perform the appraisal.

On July 10, 1990, the appraiser issued a report (the July 10 Report) that contained an opinion of SIDCOR's fair market value of $4.9 million. The July 10 Report expressly stated that the fair market value of the common stock of SIDCOR was made pursuant to paragraph 10(D)(v) of the Agreement, which reads:

"The purchase price of each share of stock shall be its proportionate share of the then fair market value of the Company's assets at said time, including the Company's share, if any, of any real property and in any then pending ventures and syndications, less the Company's then liabilities, as determined by the Company's independent accountant. *In the event that the parties are unable to agree upon the then fair cash market value of any such*

---

[1]The complaint alleged in pertinent part:

"18. SIDCOR and the selling shareholders, Devine and Gross, have been unable to agree upon the value to be placed on Gross and Devine's shares.

19. SIDCOR has selected an independent appraiser and has submitted his appraisal to Devine and Gross.

20. Gross and Devine have rejected that appraisal and have failed to or refused to propose an appraisal.

21. As such, SIDCOR and Gross and Devine have been unable to agree upon an independent appraiser to value the stock.

22. *** As such, the Court should declare that the Agreement requires the sale of the shares and, if the parties cannot agree, appoint an appraiser to value the shares of Gross and Devine for sale to Katz and Weiss."

*assets, said value shall be determined by a qualified independent appraiser selected and approved by the selling shareholder and the Company.* The fees of said appraiser shall be borne equally between the seller and the acquiring parties." (Emphasis added.)

The proper interpretation of the emphasized portion of paragraph 10(D)(v) is disputed by both parties. The view propounded by the defendants and adopted by the trial court is that the Agreement calls for a valuation of *all* of SIDCOR's assets at "fair market value." Moreover, the trial court found that the appraiser should value SIDCOR as a "going concern" taking into account future revenues.

The July 10 Report further stated that the "court's interpretive comments" regarding asset valuation, made during the February 1, 1990, proceedings, were also used to guide the appraiser. The report explained three different valuation methods for determining the value of SIDCOR's stock: (1) market comparable approach; (2) discounted cash flow analysis; and (3) net underlying assets.[2] Andersen concluded that the discounted cash flow method would be most appropriate since "any unrelated buyer of the company should be willing to pay for the expected cash flows, at their present value, adjusted appropriately for uncertainty or risk." Applying the discounted cash flow analysis, Andersen concluded the fair market value of SIDCOR to be $4.9 million which, divided by a total number of 2,550 shares, amounted to a value per share of $1,921.57.

---

[2]The "market comparable approach" is used to value a business by comparing the subject company to publicly traded companies or to companies that have been acquired and for which information is available for purposes of comparison. Andersen concluded that publicly traded companies were not comparable to SIDCOR due to the size and unique characteristics and business relationships at SIDCOR.

The "discounted cash flow analysis" method is a technique in which the value of a company or business enterprise is determined based upon estimates of future cash flows which are discounted for the time value of money and relative risk or uncertainty of the investment. Based upon this method, Andersen estimated the market value of SIDCOR to be $4,907,000.

The "net underlying assets" method is a technique in which the fair market value of all the assets of the business are determined individually and the sum of their values, less total liabilities at the date of valuation, is equal to the owners' equity in the assets of the business. According to Andersen, the net underlying assets approach is, thus, "essentially the process described by paragraph 10(D)(v) of the shareholders' agreement." Andersen further concluded that the net asset approach and discounted cash flow analysis would produce identical results given that SIDCOR's primary assets are intangible, income-producing assets such as investments in partnerships and property service agreements to provide management, leasing and brokerage services.

After both sides objected to the July 10 Report and submitted additional factors affecting valuation, the appraiser reported that SIDCOR's value could be as low as $1.5 million or as high as $8 million.[3] The appraiser then issued a tentative report on August 28, 1990 (the August 28 Report), which contained a new value of $2.14 million. The appraiser stated, however, that the fair market value could not be determined until disputed legal issues were resolved. Thereafter, the appraiser de-

---

[3]During a July 19, 1990 meeting with Andersen, the following criticisms were presented by Katz and Weiss *vis-a-vis* the July 10, 1990 Report:

1. Management fee income may be overstated in many cases due to optimistic assumptions of growth and vacancy rate.

2. Leasing fee income is overstated in nearly all cases due to optimistic assumption of vacancy rates, lack of consideration of co-op brokers, and specific circumstances at individual properties.

3. Typically, leasing fee income is deferred for two to four years to provide favorable cash flows to limited partners.

4. A financing commission was not paid at 3130, 3101 and 3121 North Lake Shore Drive due to a financing agreement negotiated with an unrelated third party.

5. Capitalization rates used to forecast property values for sales commission estimates are too low, and property value assumptions too high, resulting in optimistic sales commissions.

6. Right to sales and financing commissions are not held by SIDCOR, are controlled by the general partners and, thus, should not be included.

7. Operating expenses projections are understated because of failure to consider replacement staff and new employees to support recent growth.

8. Investment Income of Rapids Mall is overstated.

While Andersen would not comment on the reasonableness of the above comments, it conceded that its July 10 Report valuation might be reduced significantly to a range of $1.5 million.

Gross and Devine similarly met with Andersen on July 31, 1990, and made the following remarks about the July 10 Report:

1. The valuation should have included corporate good will, as measured by new business of SIDCOR.

2. Historical income figures from construction, development and syndication will be available to the company in the future and should be included in the present value.

3. As of April 15, 1989, excess working capital exceeds that required to operate SIDCOR and should be adjusted to reflect the added value of excess working capital.

4. The after-tax discount rate of 13% applied to the cash flow is too high.

Again, Andersen would not comment on the reasonableness of the above items but stated that if considered, its valuation would increase significantly to the $8 million range.

clared its July 10 Report "null and void" based upon the "contested factual items" presented by both parties.[4]

On July 24, 1990, Gross and Devine moved for entry of summary judgment in their favor on the basis of the July 10 Report. On November 13, 1990, the parties presented oral argument on defendants' summary judgment motion. Gross and Devine alleged that the July 10 Report was accurate and that Andersen had been intentionally misled by Katz and Weiss during their July 19, 1990, meeting. The information provided to Andersen by Katz and Weiss was allegedly contrived to artificially reduce SIDCOR's value. Gross and Devine contended that Andersen changed its valuation after the July 10 Report, based upon significantly different and unsolicited information from Katz and Weiss.

Although defendants conceded the accuracy of the July 10 Report, they also presented three self-perpetuating management agreements which were never provided to Andersen to be considered in the July 10 Report.[5] Plaintiffs contended that SIDCOR was not J&J entitled to collect the income from said agreements. In support of this argument, plaintiffs presented copies of agreements drafted in January of 1990,

---

[4]In its August 28 Report, Andersen commented:

"There are substantial contested facts by the parties as to what should or should not be included in the valuation. In particular, there are disagreements between the parties as to the enforceability of various management agreements and as to the legal claim of SIDCOR on future sales and financing commissions. These key issues are matters of law and we are not qualified to render a legal opinion in these areas.
\*\*\*
1. The July 10, 1990 report copies are null and void and must be returned to Arthur Andersen & Co. at once.
2. The August 28, 1990 report cannot be finalized until the contested factual items are resolved, in particular the disputes regarding rights to sales and financing commissions.
\*\*\*
*One alternative that we suggest would be that a hearing be held to allow the court to resolve the disputed legal facts.* We will then be in a position to finalize our work." (Emphasis added.)

[5]Counsel for defendants argued:

"[Andersen] did not, however, include in that [July 10] Report, any value for SIDCOR's rights to receive tax reduction fees, development fees, acquisition fees, syndication fees \*\*\*. [T]hey didn't include them because they didn't know that SIDCOR also had the right to continue to receive those income streams.
\*\*\*
\*\*\* [T]hey say that if those kinds of things were included [in the July 10 Report], the value instead of being around $5 million would probably be around $8 million."

which indicated that SIDCOR was not entitled to the revenues from the agreements. Defendants, however, described the new agreements as "dummied up" in order to suggest that SIDCOR would not be collecting revenue from its many partnership agreements.

Defendants then requested that the trial court decide as a matter of law whether the disputed management agreements represented future income to SIDCOR such that they should have been reflected in its stock value. Plaintiffs countered that SIDCOR had no legal right to the income streams from the disputed leasing and management agreements and therefore they should not have been considered by the appraiser in its valuation of SIDCOR's stock.

After reviewing the arguments and documents of both parties, the trial court commented:

> "When parties structure their business organization so that even one of the great accounting firms of the nation cannot fully sort out and understand what is being done and how the terms relate to the realities, then I would submit that however this obfuscation may serve them, they run the risk that the appraisal may be faulty and that the court may not be able to unwind the snarl of facts presented and facts to be relied on."

As to the discrepancy in the two different reports prepared by Andersen, the court attributed this to "whether or not SIDCOR's fair market value should have included or excluded certain income streams from future sales or finance commissions." The court also noted that it was "unfortunate" that Andersen took into consideration the relative hostility of the parties under the stock option agreement, since there was nothing in the shareholder Agreement which allowed for such an assumption. Moreover, the court explained that a fair market value analysis does not contemplate how the parties might disadvantage one another at a later time. Rather, the Agreement warranted an appraisal of the "then fair market value" of SIDCOR at the time when the defendants resigned from the company. The trial court further found that the August 28 Report violated the clear terms of the Agreement's valuation formula by its use of the so-called mythical unrelated buyer, since this "ignores the reality that stock in a closed corporation is never evaluated on the basis of what a stranger would pay, because a stranger would seldom pay anything to get into a deadlocked position in a closed corporation."

Summary judgment was then granted in favor of defendants finding that the proper valuation of SIDCOR's stock was reflected in the July 10 Report prepared by Andersen. The trial court concluded there was no disputed issue of fact, since both parties agreed as to the valua-

tion calculated in the July 10 Report. The only disputed issues related to the exclusion or inclusion of certain items presented by the parties to Andersen after it issued the July 10 Report. The trial court held, as a matter of law, that these additional items were properly treated by Andersen in its July 10 Report. The trial court then entered judgment for defendants based upon the valuation in the July 10 Report.

Plaintiffs appeal from this order based upon three alleged errors: (1) the July 10 Report applied a valuation method inconsistent with the terms of the Agreement; (2) the July 10 Report is factually incorrect in that it takes into account future income streams from partnership agreements; and (3) the July 10 Report was declared "null and void" by Andersen and, therefore, cannot be a basis for the trial court's judgment.

In a case involving the propriety of summary judgment, the standard of review to be applied by this court is *de novo*—the appellate court must place itself in the position of the trial court and determine whether a genuine issue of material fact exists. (*Demos v. National Bank of Greece* (1991), 209 Ill. App. 3d 655, 567 N.E.2d 1083.) Summary judgment is proper where the issues are determinable solely as questions of law. *Sidwell v. Sidwell* (1975), 28 Ill. App. 3d 580, 328 N.E.2d 595.

Turning to the merits of the summary judgment, the trial court resolved the disputed legal issues as questions of law and found that there existed no genuine issue of material fact as to the valuation of the SIDCOR stock. Construction of a contract is purely a question of law and may be determined by the trial court or the appellate court. (*Kerr Steamship Co. v. Chicago Title & Trust Co.* (1983), 120 Ill. App. 3d 998, 458 N.E.2d 1009.) The court below found that the terms of the Agreement were clear and unambiguous and construed the Agreement as a matter of law. (*South Suburban Safeway Lines, Inc. v. Regional Transportation Authority* (1988), 166 Ill. App. 3d 361, 519 N.E.2d 1005.) However, the appellate court is not bound by the trial court's findings but can examine the evidence and reach an independent conclusion. *Merchants National Bank v. Old Second National Bank* (1987), 164 Ill. App. 3d 11, 517 N.E.2d 652; *National Boulevard Bank v. Citizens Utilities Co.* (1982), 107 Ill. App. 3d 992, 438 N.E.2d 471.

The specific contractual provision at issue in this case is paragraph 10(D)(v) of the SIDCOR shareholder agreement, which reads:

"The purchase price of each share of stock shall be its proportionate share of the then fair market value of the Company's assets at said time, including the Company's share, if any, of any real property and in any then pending ventures and syndications,

less the Company's then liabilities, as determined by the Company's independent accountant. In the event that the parties are unable to agree upon the then fair cash market value of any such assets, said value shall be determined by a qualified independent appraiser selected and approved by the selling shareholder and the Company. The fees of said appraiser shall be borne equally between the seller and the acquiring parties."

The parties in this case initially conducted an appraisal of SIDCOR's assets using their own accountants. Plaintiffs' appraiser arrived at a value of $800,000 for SIDCOR's stock. In contrast, defendants' appraiser issued an appraisal valuing the company at between $22 and $26 million. The gross divergence in values prompted plaintiffs to file the instant action seeking equitable relief, the enforcement of the Agreement and the appointment of an independent appraiser in accordance with paragraph 10(D)(v) of the Agreement. The trial court responded by appointing the national accounting firm of Arthur Andersen.

We initially consider whether Andersen applied a valuation method inconsistent with paragraph 10(D)(v) of the Agreement. In its July 10 Report, Andersen sets forth in great detail the various valuation methods available and the theory supporting each method. The report further states that the method employed, discounted cash flow analysis, was most consistent with the "fair market value" as described in paragraph 10(D)(v) of the Agreement.

The function of an appraiser is to appraise value pursuant to the terms of the agreement from which it obtains its authority. (*Union Trust Co. v. Board of Education* (1932), 348 Ill. 256, 180 N.E. 819.) An appraiser may not exceed the authority conferred upon it by the agreement appointing it. (*Chicago Title & Trust Co. v. Northwestern University* (1976), 36 Ill. App. 3d 165, 344 N.E.2d 52.) In the event of disagreement, the court maintains the final authority to interpret the language of the agreement. (*Schipper & Block, Inc. v. Carson Pirie Scott & Co.* (1970), 122 Ill. App. 2d 34, 256 N.E.2d 854.) Where the terms of a contract are clear and unambiguous, a reviewing court must enforce the contract as written. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.* (1990), 194 Ill. App. 3d 744, 551 N.E.2d 340; *Madigan Brothers, Inc. v. Melrose Shopping Center Co.* (1984), 123 Ill. App. 3d 851, 463 N.E.2d 824.

In the instant case, the assets of SIDCOR are primarily intangible income streams, consisting of management, leasing, financing and brokerage fees paid to SIDCOR by a number of real estate investment partnerships. The discounted cash flow analysis applied by Andersen is

the most appropriate means of evaluating such future income streams, discounted to their present value and then incorporated into SIDCOR's stock value. This court is not prepared to second-guess the judgment of the appraiser in employing this valuation method, particularly where there appears to be no obvious inconsistency or contradiction with the valuation described in the Agreement. We, therefore, find as a matter of law that the valuation method employed by the independent appraiser was the most appropriate method for determining the fair market value of SIDCOR, as described in paragraph 10(D)(v) of the shareholder agreement.

We now turn to the central issue to be resolved by this court, that is, whether or not certain future income streams to SIDCOR should have been considered by Andersen in its appraisal. In its July 10 Report, Andersen included a present valuation for the future sales and finance commissions to be received by SIDCOR from 14 different partnership agreements in existence as of April 15, 1989. After issuance of the July 10 Report, plaintiffs met with Andersen and claimed that this future income should not have been included since SIDCOR possessed no legal right to future fees from these partnerships. Secondly, plaintiffs contended that even if the fee income is relevant to valuation, only 8 of the 14 partnership agreements entitle SIDCOR to leasing and management fees, since the other six agreements do not grant SIDCOR exclusive rights to future leasing and management fees.

Defendants likewise met with Andersen after the initial report and informed Andersen that it failed to include future fee income from an additional three partnership agreements, entered into by SIDCOR after April 15, 1989. Defendants also requested that future income from syndication, construction and development, based upon historical figures, be included in the stock valuation.

After reevaluating SIDCOR in light of the aforementioned factors, Andersen concluded that its original July 10 Report was "null and void," because of the additional information presented by the parties. Andersen also stated that the fair market value of SIDCOR, based upon this new information, could be as low as $1.5 million or as high as $8 million. Andersen further stated that it could not render a value for SIDCOR's stock until these disputed legal issues were resolved by the trial court.

While there are no precise rules for determining the fair market value of a company's stock, courts have held that a proper valuation mandates the exercise of a court's judgment after considering all relevant factors. (*Ahlenius v. Bunn & Humphreys, Inc.* (1934), 358 Ill. 155, 192 N.E. 824.) Factors to be considered include the book value of the

stock, the nature of the business, the economic outlook of the industry, the earnings capacity of the company, the possible goodwill of the company and the market price of the stock. (*Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475.) The particular weight to be accorded each factor is particularly a matter for the trial judge. *Taxy v. Worden* (1989), 181 Ill. App. 3d 97, 536 N.E.2d 901.

■ While appraisals are to be considered by the court in arriving at fair market value, they are not binding as a matter of law and are but one source of information to be weighed and evaluated. Moreover, courts have properly rejected the appraisals of the parties where the record reveals that such appraisals are not completely accurate. (*Independence Tube Corp. v. Levine* (1988), 179 Ill. App. 3d 911, 535 N.E.2d 72.) Just as the court may adopt the valuation rendered by an appraiser, it may also reject all outside appraisals and render its own per-share value for the stock at issue. In at least one case, the trial court rejected the stock values rendered by its own appraiser as well as the defendant's appraiser and arrived at a stock value falling mid-way between the two appraisals. *Institutional Equipment & Interiors, Inc. v. Hughes* (1990), 204 Ill. App. 3d 922, 562 N.E.2d 662.

Stock valuation becomes increasingly difficult and complex where, as in this case, the company at issue is closely held and its stock is not publicly traded. The primary contention raised by plaintiffs on appeal is that the independent appraiser and the trial court failed to exclude from SIDCOR's stock value certain future income streams from 14 partnership agreements maintained by SIDCOR. It was largely based upon this potentiality that Andersen subsequently rendered the July 10 Report void and concluded that the actual value of SIDCOR could be as low as $1.5 million.

■ After reviewing the terms and conditions of the 14 different partnership agreements with SIDCOR, we find as a matter of law that SIDCOR was entitled to the fees and commissions generated by the underlying investment property. In each of the partnership agreements, fees and commissions are specifically directed to SIDCOR, to the general partners or to an affiliate. Where SIDCOR is specifically named, there can be no doubt as to the legal right of SIDCOR to collect the fees. Where the term "affiliate" is used, the right of SIDCOR to collect such fees remains unimpaired since SIDCOR has been the only affiliate of both sets of general partners in the nine years previous to defendants' resignation.

Where the term "general partner" is used, the meaning is not clear on its face since several of the partnership agreements contain third-party general partners other than SIDCOR. Where the terms of an

agreement are ambiguous and subject to more than one interpretation, the court may look to the custom and usage of the parties to determine their meaning. In this case, it was the custom and practice of the general partners to interpret the term "general partner" to mean SIDCOR. Indeed, the parties' diverse holdings and numerous limited partnership ventures necessitated the creation of SIDCOR as a device to consolidate the operational needs of these partnerships. For nine years, it was the custom and practice of SIDCOR to provide the real estate and financial services to the partnerships exclusively. In the words of the trial court, "Neither side is disadvantaged by the court giving meaning to a term in a fashion which is consistent to the meaning they themselves have operated under for years."

Plaintiffs also attempt to persuade this court that such fees, even if paid to SIDCOR in the past, will not continue in the future, after ownership has transferred to plaintiffs. We similarly are not convinced. We would be naive to assume that plaintiffs, after acquiring 100% ownership of SIDCOR, would unilaterally decide to abandon their right to collect fees from the limited partnerships in which plaintiffs will be general partners. If this were true, then one can only wonder why plaintiffs would exercise their option to purchase defendants' shares, given that the fees and commissions of the prior nine years would be terminated. Moreover, these fees are not speculative. Plaintiffs' acquisition of 100% of SIDCOR provides them with the control necessary to maintain these fees into the future.

Insofar as the other items presented by plaintiffs to undermine the validity of the Andersen July 10 appraisal, following a thorough review of the record, we adopt the findings of the trial court, that these items were properly considered by Andersen in its July 10 Report and do not invalidate this initial appraisal.

■ Plaintiffs' final argument, that the July 10 Report cannot be relied upon by the trial court, is similarly without merit. Although Andersen declared the July 10 Report null and void, it stipulated that the sole reason for this reversal of position was the additional information provided by both parties *after* the issuance of its initial valuation. Andersen further stated that it could not issue a new report until the disputed legal issues were resolved by the trial court.

The mere fact that one or more parties to an appraisal disavows or bewails its results does not invalidate or nullify the good-faith conclusions of the appraiser. Appraisers are equipped with broad discretion as to their methods of procedure and sources of information. Absent fraud or mistake, the conclusions of an appraiser will be binding upon the par-

772

ties. *Board of Education v. Gorenstein* (1989), 179 Ill. App. 3d 388, 534 N.E.2d 579; see also *Sebree v. Board of Education* (1912), 254 Ill. 438, 98 N.E. 931; *Pearson v. Sanderson* (1889), 128 Ill. 88, 21 N.E. 200; *Stose v. Heissler* (1887), 120 Ill. 433, 11 N.E. 161; *Norton v. Gale* (1880), 95 Ill. 533.

This court has examined the additional factors presented by both sides, following the appraiser's July 10 Report, and hereby finds as a matter of law that these additional factors should not have altered the fair market value of SIDCOR as reflected in the July 10 Report. Therefore, we conclude that the July 10 Report issued by the appraiser reflects the fair market value of SIDCOR as of April 15, 1989.

For all of the foregoing reasons, the judgment of the Cook County circuit court, granting summary judgment in favor of defendants, based upon the valuation contained in the aforesaid July 10 Report, is hereby affirmed in all respects.

Affirmed.

RIZZI and GREIMAN, JJ., concur.