PENNSYLVANIA LIFE INSURANCE COMPANY *et al.*, Plaintiffs-Appellees and Counterdefendants, v. MICHAEL PAVLICK *et al.*, Defendants-Appellants and Counterplaintiffs.

First District (4th Division)   No. 1—93—1961

Opinion filed June 30, 1994.

Karla Wright, Ltd., of Chicago (Karla Wright, of counsel), for appellants.

Law Offices of James T.J. Keating, P.C., of Chicago (Faustin A. Pipal, Jr., and Dennis A. Berg, of counsel), for appellees.

JUSTICE THEIS delivered the opinion of the court:

This case involves interpretation of certain commission contracts in which defendants-appellants, Michael Pavlick and Gregory Jansen, agreed to sell insurance for plaintiffs, two affiliated insurance companies known as Pennsylvania Life Insurance Company and Executive Fund Life Insurance Company (referred to collectively as the Companies). According to the compensation schedule included in defendants' branch manager agreements with the Companies, commissions were to be calculated as a percentage of the net profits generated by certain business received by the Companies. Subsequent written amendments to the agreements added "business codes" to which additional commissions would be paid, but these amendments lacked explicit language stating that commissions would be based on a percentage of net profits. Defendants filed a counterclaim against the Companies, seeking recovery of commissions based on a percent-

age of the business received by the Companies on certain insurance policies, or "premiums." The trial court granted the Companies' motion for summary judgment on the counterclaim, finding that the amendments were not ambiguous and that the amendments required payment of commissions based on a percentage of net profits.

The issue before this court is whether the commissions were to be calculated on the basis of net profits or on the basis of premiums. We agree with the trial court that the commissions were to be based upon net profits and affirm.

## FACTUAL BACKGROUND

Defendants Michael Pavlick and Gregory Jansen began working with Pennsylvania Life Insurance Company and Executive Fund Life Insurance Company as sales agents in 1978 and were promoted to the position of branch managers in the early 1980s. Upon becoming branch managers, Pavlick and Jansen individually executed manager agreements with each company. The agreements authorized Pavlick and Jansen to recruit, appoint, and train sales agents to sell the Companies' policies. The agreements consisted of printed contracts supplied by the Companies, customized with typed language inserted in the blanks.

The agreements contained a compensation schedule describing how the Companies would calculate defendants' commissions. The Companies had divided their business into different regions, each of which corresponded to a numerical code. The compensation schedule identified those regions or codes for which a manager would receive commissions. Each printed compensation schedule contained blanks in which the parties could specify the commission percentages and applicable business codes:

"3. Manager shall receive _____ percent (____%) of the profits, as defined below, of the business coded _____."

After signing the manager agreements, the parties executed a series of written amendments to the agreements. The amendments increased a manager's compensation by adding new codes upon which he or she would be paid commissions. Like the original manager agreements, these amendments consisted of printed forms signed by a representative of the Companies and either Jansen or Pavlick. Each of the one-page amendments contained a typewritten paragraph which specified the date when the amendment became effective and the percentage of commission due on a designated business code.

Between April 1983 and October 1984, Jansen and the Companies signed six amendments. One such amendment provided:

"Effective April 1, 1983 GREGORY JANSEN shall participate in TWENTY percent (20%) of the net profits, or loss, on business coded 004877 (Operation Share-Homewood, II) in accordance with terms and conditions provided in Branch Manager Agreement."
Pavlick did not sign any amendments during this time period.

Between October 1984 and August 1988, Jansen and the Companies entered into 15 additional amendments. Pavlick signed two amendments in November 1988. Unlike the manager agreements and the first six amendments which Jansen signed, the post-October 1984 amendments did not explicitly state that commissions would be based on a percentage of net profits. Instead, these amendments provided that the commissions would be based on a percentage of business received by the Companies on certain insurance policies. One such amendment provided:

"Effective February 1, 1987 #3 of Compensation Schedule of Branch Manager Agreement shall include: TEN Percent (10%) of business coded 005884."

Pavlick and Jansen voluntarily terminated their relationship with the Companies in July 1990 and September 1990, respectively.

In April 1991, the Companies filed a two-count complaint against Jansen and Pavlick, alleging breach of contract and tortious interference with contractual relations. The complaint alleged in part that defendants violated certain post-employment restrictive covenants not to compete against the Companies by soliciting customers and sales agents away from the Companies. Defendants responded by filing a counterclaim for an accounting of commissions which the Companies allegedly owed them. Defendants alleged that their respective compensation schemes entitled them to receive commissions on a percentage of the "business" or "premiums" received by the Companies on certain insurance policies.

The parties then filed cross-motions for summary judgment. The Companies argued that the manager's agreements and amendments provided that any commissions due and payable to defendants would be based upon a percentage of resulting or net profits, and not "premiums" or "business." Defendants contended that they were entitled to a percentage of "business" the Companies received on codes identified in the amendments.

The trial court granted the Companies' motion for summary judgment and denied defendants' motion. In announcing his decision, the trial judge explained that the amendments were unambiguous[1] and that they required payment of commissions based on a percentage of net profits. Defendants now appeal from the trial court's ruling.

---

[1]The parties here do not dispute that the transcript of the lower court's

## DISCUSSION

Defendants first contend that the court erred in denying their cross-motion for summary judgment on the issue of liability, and in granting the Companies' summary judgment motion. Summary judgment is proper when the pleadings, affidavits, and other evidence on file viewed in the light most favorable to the nonmovant demonstrate that there is no issue of material fact and that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005; *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.* (1993), 256 Ill. App. 3d 31, 34, 628 N.E.2d 1165, 1168.) The construction of a contract is a question of law for the trial judge and thus suitable for summary judgment. (*Omnitrus Merging*, 256 Ill. App. 3d at 34, 628 N.E.2d at 1168.) Where the trial judge has determined the construction of a contract as a matter of law, this court's standard of review is *de novo* and we may interpret the contract independently of the trial court's judgment. *Bank of Ravenswood v. Polan* (1993), 256 Ill. App. 3d 470, 474, 628 N.E.2d 194, 197; *Superior Investment & Development Corp. v. Devine* (1993), 244 Ill. App. 3d 759, 767, 614 N.E.2d 302, 307.

The court's primary objective in construing the provisions of a contract is to give effect to the intent of the parties at the time the contract was made. (*Bank of Ravenswood*, 256 Ill. App. 3d at 474, 628 N.E.2d at 197.) When the terms of the contract are clear and unambiguous, the parties' intent must be ascertained from the language of the contract itself. (*Sigma Cos. v. Regas* (1993), 255 Ill. App. 3d 857, 861, 627 N.E.2d 256, 260.) Clear and unambiguous terms must be ascribed their ordinary and natural meaning. (*Omnitrus Merging*, 256 Ill. App. 3d at 34, 628 N.E.2d at 1168.) A contract term will only be found to be ambiguous if it is reasonably or fairly susceptible to more than one interpretation. (*Omnitrus Merging*, 256 Ill. App. 3d at 34, 628 N.E.2d at 1168.) A provision in a contract is not rendered ambiguous simply because the parties do not agree on its meaning. *Holden v. National Boulevard Bank* (1992), 231 Ill. App. 3d 26, 33, 596 N.E.2d 47, 52.

We note initially that the amendments were not intended to supersede the terms of the manager's agreements. Each amendment in fact states that it "shall modify, amend or supersede only those provisions of the agreement which are expressly in conflict with it,

oral ruling erroneously recorded the trial judge's characterization of the amendments as "ambiguous." The transcript should have stated that the judge found the amendments "unambiguous."

all other terms of the agreement being incorporated herein by this reference as though set forth in full." With the exception of any such express conflicts, "all of the terms of the agreement are and shall remain in full force and effect."

We agree with the trial judge that the language in the manager agreement and its amendments is clear and unambiguous. While the amendments did add new business codes upon which a percentage of profits would be paid, defendants have not identified any provisions of the amendments that expressly conflict with the terms of the compensation scheme set forth in the branch manager agreement. Under that scheme, the branch manager is entitled to receive a percentage of resulting profits in the participating office codes assigned to him or her. Because the amendments do not expressly conflict with the provisions of the agreements, the terms of the agreements remain in full force.

Defendants next argue that the definition of "profits" contained in paragraph 4 of the compensation schedule is restricted only to that paragraph and does not apply to any of the subsequent amendments. Defendants focus on the phrase "as used herein" at the beginning of the paragraph and suggest that this language expressly confines the definition of "profits" to paragraph 4. Defendants note, further, that the term "profits" does not appear in the amendments at all.

Paragraph 4 sets forth how profits would be calculated:

"4. The term 'profits,' *as used herein*, is calculated as follows:

(a) There shall be allocated to the Branch certain commissions, first year and renewal, from the gross premiums actually received by the Company on business produced by the Branch in accordance with the schedules of commissions which are attached hereto and made a part hereof. Additional schedules of commissions may be added hereto in the form of addenda at the discretion of the Company. There shall be no commissions allocated to the Branch on undelivered or cancelled policies, or on applications not accepted by the Company.

(b) There shall be deducted from all such commissions allocated to the Branch the following *** and all other expenses of any nature paid or incurred by the Company or the Branch as a part or in connection with the operations or business of the Branch, other than personal expenses.

(c) After all the aforesaid computations have been made, the Branch Manager shall receive the percent of the

resulting profits in the participating office codes assigned to him by the Home Office as set forth below." (Emphasis added.)

We do not find the absence of any reference to "profits" in the amendments to be significant. Because the compensation scheme in the underlying manager agreements had already set forth how commissions would be based on net profits, any further discussion of "net profits" in the amendments would be duplicative and superfluous.

Affirmed.

HOFFMAN, P.J., and JOHNSON, J., concur.