2015 IL App (1st) 1122607
No. 1-12-2607

THIRD DIVISION
January 28, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| KRIS DANIEL and MARK DANIEL, Independent Co-Executors of the Estate of Benjamin S. Daniel, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees and Cross-Appellants, | ) ) ) | No. 07 CH 1061 |
| v. | ) ) ) | The Honorable Rita M. Novak, Judge Presiding. |
| DONALD P. RIPOLI, V. JAMES GRIECO, ARNOLD N. SHORN AND COMPANY, an Illinois Partnership and ARNOLD N. SHORN AND COMPANY, LLC, an Illinois Limited Liability Company, | ) ) ) ) ) ) | |
| Defendants-Appellants and Cross-Appellees. | ) ) ) | |

_____

PRESIDING JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     This action was brought by the defendant limited liability company's (LLC) deceased

member's estate to recover the amount of LLC distributions allegedly due to the decedent under

the member's participating percentage in the LLC's operating agreement. The members

subsequently executed an agreement modifying the decedent's participating percentage in the

LLC under the operating agreement. The trial court found that the agreement did not effect a permanent change for the member's participating percentages and that, after the years specified in the agreement, the decedent was due the amount of his original participating percentage, which was awarded to the estate. The court entered judgment against the LLC only and held that the individual LLC members had no personal liability. The LLC appealed, arguing that the court misinterpreted the agreement and that the modification was a permanent change in the participating percentages, and the estate cross-appealed, arguing that the other LLC members also had individual liability and that the LLC conversion failed, that the damages were not based on the evidence, and that the estate was further entitled to post-death distributions to the decedent.

¶ 2        The estate argues as a threshold matter that we do not have jurisdiction of this appeal because we should disregard the timely circuit court file stamp on the face of the notice of appeal as insufficient because it was allegedly stamped at a "self service" box and because it was not stamped specifically by the civil appeals division of the circuit court. There is a dearth of precedent squarely holding that a circuit court file stamp is considered the date the court received the notice of appeal for purposes of jurisdiction. We hold that it is.

¶ 3        As to the merits of the LLC's appeal, we hold that the circuit court erred in determining that the subsequent agreement effected a change in the decedent member's participating percentage in the LLC for only the years 2003 and 2004. Further, we clarify that our standard of review, although the court heard extrinsic evidence, is nevertheless *de novo* where the trial court bases its judgment solely on its interpretation of a contract. Here, the contract terms are plain and unambiguous and do not limit the change in the capital accounts to only certain years. The court therefore erred in its entry of judgment in favor of the estate and award of damages to the estate.

We reverse the entry of judgment and award of damages to the estate on its claim. Although the LLC asserted that it was entitled to entry of judgment and award of damages from the estate on its counterclaim, the LLC waived this argument because it included no authority in its appellate brief, and so we affirm the entry of judgment in the estate's favor and against the LLC on the LLC's counterclaim.

¶ 4    As to the estate's cross-appeal, we hold that the Illinois Limited Liability Company Act (805 ILCS 180/1-1 *et seq.* (West 1998)) is clear regarding the requirements for an effective conversion to an LLC, which were met in this case, and that individual LLC members have no personal liability. The estate did not provide any support for its contention that an estate could bring suit against the individual LLC members, thereby forfeiting this argument. Also, the trial court's damage award was firmly based on the evidence presented by the estate's expert and the LLC did not present its own countering expert testimony regarding the calculation of damages. But the estate is not entitled to post-death distributions, as an addendum to the operating agreement provided that no post-death distributions would be paid unless a loan taken by decedent and another LLC member was repaid, and there was insufficient evidence that this loan was in fact repaid. We therefore affirm these portions of the court's order finding that defendants Donald Ripoli and James Grieco have no individual liability and denying the estate distributions on death.

¶ 5                                    BACKGROUND

¶ 6    The parties in this case disputed many facts and issues below in the claim and counterclaim. We summarize only the facts pertinent necessary to a resolution of the limited grounds of the appeal and cross-appeal.

¶ 7 Beginning in December 1976, defendant Donald Ripoli and plaintiffs' decedent Benjamin Daniel were partners in the public accounting firm of Arnold N. Schorn & Co., an Illinois general partnership. On December 31, 1998, Ripoli and Daniel filed articles of organization and a statement of conversion with the Illinois Secretary of State, which converted the Arnold N. Schorn & Co. partnership into a limited liability company called the Arnold N. Schorn & Co. LLC. The statement of conversion stated that "[e]ach partner voted for the conversion." The articles became effective on January 1, 1999.

¶ 8 On June 1, 1999 defendant James Grieco became a member of the LLC, and the members entered into an operating agreement providing that the members' participating percentage of profit allocation would be as follows if the LLC's profit was $600,000 or less: 36.5% to Grieco; 36.5% to Ripoli; and 27% to Daniel. Under the operating agreement, Daniel, Ripoli, and Grieco "approved and ratified" the articles of organization and agreed to operate the business under the Illinois Limited Liability Company Act (805 ILCS 180/1-1 *et seq.* (West 1998)) and the operating agreement. The operating agreement further provided that "the rights[,] duties and liabilities of the members shall be those provided in the Act as amended from time to time."

¶ 9 According to the operating agreement, the capital account of a deceased member would be paid over to the member's estate within six months of the date of death. The operating agreement provided that "any capital deficit must be eliminated within 60 days of when the deficit occurs." The operating agreement set forth a formula for distributing additional disbursements upon the death of a member. The operating agreement also contained a buy-out provision to be effective upon any member's death. The operating agreement also permitted amendment by majority approval but required consent of the affected member if the amendment would reduce the participating percentage of that member other than on a *pro rata* basis.

¶ 10    On October 6, 1999, Ripoli and Daniel entered into an amendment to the operating agreement in which they opted out of the buy-out provision and agreed that this provision would not apply to them unless and until a prior bank loan from American National Bank was paid. The evidence did not establish whether this loan was ever paid off. Grieco did not sign this agreement.

¶ 11    On November 3, 2003, the three members met to discuss a disparity between Daniel's participating percentage and the actual income generated from Daniel's clients. As the Daniel estate's expert, Mike Ryan, testified, from 2000 to 2003 Daniel was given credit for contributing 27%, but his clients paid the LLC only 17%. As a result, Daniel had a negative capital account with the firm. A "capital account" is an accounting term. A capital account represents an accumulation of each member's contributions minus the member's distributions from all prior years and reflects the corresponding amount due between members, if distributions exceed contributions. At trial, Ripoli explained that a capital account is "the difference between *** the earnings of each individual member minus the draws of each individual member."

¶ 12    The minutes from the meeting of November 3, 2003 revealed that Ripoli's book of business was on target with his participating percentage, at approximately 35.85%. However, Grieco's book of business in 2003 accounted for approximately 50% of the LLC's income, whereas his participating percentage under the operating agreement was set at 36.5%. Daniel's book of business in 2003 amounted to only 13.5% of the LLC's income, while his participating percentage under the operating agreement was 27%. The minutes also reflect that Daniel's capital account was shown as a negative ($79,379).

¶ 13    Daniel's negative capital account and the disparity between Grieco's and Daniel's contributions in the form of client payments and what each was credited and distributed under

the operating agreement created tremendous friction between the partners and threatened to lead to the dissolution of the LLC. The minutes of the members' November 3, 2003 meeting state: "Current ratios will not allow the firm to continue. A disproportionate share of income and draws are directed to Ben Daniel." (Emphases in original.)

¶ 14    On November 24, 2003 the members met again to continue discussing this disparity and discussed various proposals to correct this disparity. The minutes of this meeting indicate that the first option discussed was termination of the firm as of October 31, 2003. The members decided against this option, however, because at the time the firm liabilities exceeded its assets. The second option discussed was that Daniel's clients would remain with the firm but Daniel would "retire" and he would be paid for those clients on a "fee per hour basis."

¶ 15    Under the third option, which is the option the members ultimately agreed upon, the LLC would continue with Daniel as an active member but with adjustments made to his draws. Specifically, the first $100,000 of Daniel's clients' cash payments to the firm would be used to pay Daniel's share of expenses. In the event that Daniel's clients paid more than $100,000 he would then receive a draw limited to a maximum of $5,500 per month or $66,000 annually. If Daniel's clients paid more than $166,000, any difference would be paid to the firm as a reduction of Daniel's negative capital account. The firm would provide Daniel with health and life insurance as a firm expense, with the firm designated as the beneficiary of the life insurance policy. Daniel would also be required to sign a promissory note for his negative capital account.

¶ 16    On December 8, 2003, the members, including Daniel, signed an agreement stating that for the year 2003 the members were not going to follow the participating percentages of the original operating agreement. Instead, they would determine that year's participating percentage

based on a review of the LLC's financial statements for the year ending December 31, 2003. The agreement provided as follows:

"THE UNDERSIGNED, MEMBERS OF ARNOLD N. SCHORN & CO., LLC, HEREBY AGREE THAT THE PROFIT ALLOCATION AMONG MEMBERS AS REFLECTED IN THE AGREEMENT SIGNED BY THE MEMBERS IN 1999, WILL NOT APPLY TO THE YEAR 2003.

FOR THE YEAR 2003, THE PROFIT ALLOCATION TO BE USED FOR MEMBERS WILL BE DETERMINED UPON REVIEW OF ARNOLD N. SCHORN & CO., LLC FINANCIAL STATEMENTS FOR THE YEAR ENDED DECEMBER 31, 2003."

¶ 17     On January 14, 2004, the members, including Daniel, signed another agreement titled, "POINTS FOR AGREEMENT–MEMBERS OF LLC–CHANGES TO OPERATING AGREEMENT SIGNED IN 1999." The members agreed to change their capital accounts as of December 2003 to reflect the actual percentages of what each member's clients cash receipts were, minus each member's actual distributions. The agreement provided the following:

"1. CAPITAL ACCOUNTS TO BE RESTATED AS OF 1/1/03 BASED UPON A RATIO OF CASH RECEIPTS PER PARTNER CLIENTS TO TOTAL CASH RECEIPTS APPLIED TO NET INCOME FOR THE YEAR."

¶ 18     The agreement provided for an adjustment to each member's capital account beginning in 2003 based on the member's actual income to the firm minus his actual distributions from all prior years, referred to by defendants as a "running scoreboard" concept. Paragraph 2 of the January 14, 2004 agreement identified the percentage of actual cash receipts each member's clients paid to the firm in 2003 and allocated profit and loss accordingly for 2003.

¶ 19     Paragraphs 3 and 4 addressed Daniel's draws for 2004 in detail and provided as follows:

"3. FOR YEAR 2004–DRAWS FOR BSD [Daniel] LIMITED TO EXCESS OF CASH RECEIPTS FROM BSD MEMBER CLIENTS LESS $100,000. MAXIMUM DRAW DISTRIBUTION IN ANY MONTH LIMITED TO $5,500. IF DRAW SHOULD BE LARGER THAN $66,000 ($5,500 X 12 months) EXCESS TO REDUCE NEGATIVE CAPITAL ACCOUNT. IF COLLECTIONS DO NOT WARRANT A $66,000 DRAW, $5,500 WILL BE REDUCED ACCORDINGLY. HEALTH AND DENTAL INSURANCE, AICPA LIFE INSURANCE AND $50,000 INSURANCE ON LIFE OF BSD [Daniel] WITH FIRM AS BENEFICIARY, WILL BE CONSTRUED AS OPERATING EXPENSES FOR THIS COMPUTATION. INCOME ALLOCATION WILL BE BASED UPON CASH RECEIPTS FROM MEMBER CLIENTS TO TOTAL CASH RECEIPTS FROM MEMBER CLIENTS.

4. E.G. MONTHLY CONTRIBUTORY EXPENSES $8,333. THIS IS CARRIED OVER MONTH TO MONTH MINIMUM CASH REQUIREMENT FOR DRAW TO BE PAID $8,222 X # OF MONTHS–CASH RECEIPTS TO DATE.

COLLECTIONS IN ANY ONE MONTH ARE FIRST APPLIED TO THE $8,333 REQUIRED CONTRIBUTION. DRAW OF UP TO $5,500 CAN THEN BE TAKEN. IF TOTAL RECEIPTS ALLOW.

IF AMOUNT COLLECTED IS LESS THAN $8,333 LESS AMOUNT COLLECTED IS CARRIED OVER TO THE FOLLOWING MONTH. NO DRAW WILL BE TAKEN FOR THAT MONTH. IN THE SUBSEQUENT MONTH THE $8,333 PLUS CARRIED OVER AMOUNT NEEDS TO BE COLLECTED BEFORE A DRAW IS PAID."

¶ 20     The January 14, 2004 did not specifically address Daniel's draws for any years beyond 2004.

¶ 21     From the beginning of the LLC to the end of 2003, based on actual payments made by Daniel's clients, minus the actual distributions Daniel received, Daniel had a negative capital account of $218,492. This amount was reflected in the January 14, 2004 agreement.

¶ 22     The result of the January 14, 2004 agreement was that Daniel received a substantially reduced distribution. The total distribution to Daniel in 2003 was $210,806. Beginning in January 2004, Daniel received only $500 per month in draws, plus the payment of his health insurance benefits. His total distribution for 2004 was $38,448. For the years 2004, 2005, and 2006, Daniel's participating percentage in the LLC was reduced to 9.3% in 2004, 7.95% in 2005, and 0% in 2006. Daniel accepted these reduced distributions.

¶ 23     In November 2004, Daniel wrote a memo to Ripoli and Grieco to "discuss the compensation policy for Ben Daniel [year 2004] and to discuss what is fair for all concerned." Daniel asserted that the December 8, 2003 agreement was signed regarding "compensation by the partners for 2003 only" and that "nothing has been signed for 2004." Daniel wrote that he wanted $1,000 per month for living expenses and payment for his estimated taxes and health insurance. Daniel wrote in his memo: "The difference between my share of gross collections and the net to me above will be kept by the firm to reduce my deficit in my capital account." Nevertheless, Daniel continued to receive and accept reduced distributions under the reduced participating percentage.

¶ 24     The LLC members all abided by the terms of the January 14, 2004 amendment to the operating agreement until Daniel passed away. Daniel died on July 12, 2006. After Daniel's death, his estate brought this action in a four-count verified complaint against Ripoli, Grieco, the

Arnold N. Schorn & Co. partnership, and the LLC, seeking the amount the estate claimed was owed to Daniel under the amended terms of the operating agreement. Count I alleged breach of contract for breach of the buy-sell agreement by Ripoli and the partnership and asserted, as a factual predicate to this claim, that the conversion from a partnership to an LLC failed. Count II sought a declaratory judgment that under the December 8, 2003 agreement and the January 14, 2004 agreement Daniel's participating percentage in the LLC was 27%, the original participating percentage, for the years 2004, 2005, and 2006. Count III sought rescission of the January 14, 2004 agreement based on Grieco's and Ripoli's breach of fiduciary duty to Daniel. Count IV sought an accounting.

¶ 25 Defendants filed a two-count counterclaim. Count I sought damages for an account stated for Daniel's negative account to recover all amounts Daniel allegedly owed. Count II was brought by Ripoli individually to recover $1,870.38 he allegedly personally paid as the premiums due on the life insurance policy purchased by the LLC and the balance due on a loan he and Daniel had co-signed dated September 23, 2004.

¶ 26 On March 26, 2009, the Daniel estate field a verified first amended complaint, which alleged the same four original counts, as well as adding two more counts, counts V and VI. Count V sought a declaratory judgment that the January 14, 2004 agreement was unenforceable for lack of consideration, and count VI sought a declaratory judgment regarding some of the terms used in the January 14, 2004 agreement.

¶ 27 After discovery, the parties filed cross-motions for summary judgment. The estate filed a motion for summary judgment on counts I and V and for summary judgment seeking a declaration under count II that Daniel's participating percentage was 27% (the original operating

agreement percentage) for the years 2004, 2005, and 2006. Defendants filed a motion for summary judgment in their favor on count III.

¶ 28    On February 3, 2010, the court granted the estate's motion for summary judgment as to the issue of Daniel's participating percentage under count II in part as to 2004, but denied the estate's motion on this count as to the years 2005 and 2006, finding that the January 14, 2004 agreement did not mention the years 2005 and 2006. The court denied the estate's motion for summary judgment on counts I and V.

¶ 29    The court granted defendants' motion for summary judgment on count III (breach of fiduciary duty), finding that the Daniel estate's assertion of the Dead-Man's Act (735 ILCS 5/8-201 (West 2010)) rendered them unable to prove that Grieco and Ripoli breached their fiduciary duty to Daniel.

¶ 30    Regarding count I, the court solicited briefing from the parties and the estate filed a "Motion for the Declaration of the Consequences from the Faulty Conversion." The court denied the estate's motion on July 27, 2010, finding that, notwithstanding the confusing manner in which the LLC members maintained certain partnership documents and tax returns, the LLC conversion occurred as a matter of law under section 37-10 of the Limited Liability Company Act. See 805 ILCS 180/37-10 (West 2010).

¶ 31    The estate then filed an amended complaint asserting the same six counts, which defendants answered.

¶ 32    The court held a bench trial from June 20-22, 2011. The estate relied only on stipulated LLC documents and tax returns and the testimony of its expert, certified public accountant (CPA) Mike Ryan. Ryan testified that Daniel's combined capital account in the LLC at the time of his death was $142,967. The estate entered into evidence Ryan's expert report, which set forth

his opinions based on a review of the LLC's books and premised on the assumption that the January 14, 2004 agreement was unenforceable. Daniel's capital account after his death, as of December 31, 2003, was a negative $218,492. Ryan testified that if the January 14, 2004 agreement was "enforceable," then Daniel's capital account would be negative $218,491, based on the assumption that the January 14, 2004 agreement effected a permanent change to the reduced percentage to Daniel. Ryan testified that if the court found the January 14, 2004 agreement was unenforceable, Daniel would be entitled to 27% of the firm's revenue under the original operating agreement, regardless of what his clients actually paid the firm for the years 2004, 2005, and 2006.

¶ 33     Ryan testified that if the partnership was converted into an LLC, and if the January 14, 2004 agreement was effective only through 2004, under the original participating percentages of the LLC for the years 2005 and 2006 Daniel's capital account would have been positive in the amount of $142,967 and that this would have been the amount owed to Daniel.

¶ 34     On cross-examination, Ryan testified that if the January 14, 2004 agreement permanently changed the members' participating percentages to reflect what their clients actually paid to the LLC, Daniel would have a negative capital account and would owe the LLC $110,515.

¶ 35     Defendants moved for a directed finding on counts II, IV, and V at the close of plaintiffs' case, which the court took under advisement.

¶ 36     Defendants then offered the testimony of Nancy Ciolino, Ripoli (via evidence deposition), and Grieco. Ciolino testified that she was hired by the Arnold N. Schorn & Co. partnership in 1981 as the office manager and was continuously so employed after the partnership was converted to an LLC. As the office manager, Ciolino was responsible for compiling the information used to prepare the LLC's cash receipts and tax returns. Ciolino

testified that Daniel never objected to any distributions he received after January 14, 2004 or to any of the tax returns prepared after that date.

¶ 37　Ripoli testified that the parties' readjustment of the income side of the capital accounts was intended to be permanent.

¶ 38　Defendants did not offer any countering expert testimony regarding the calculation of the participating percentages under the operating agreement and the January 14, 2004 agreement.

¶ 39　The court entered an order on July 13, 2011, granting defendants' motion for a directed finding in their favor on count III, since the court had previously granted defendants summary judgment on this count and the estate's allegations did not change in their subsequent amended verified complaint. The court also granted defendants' motion for directed finding on counts IV and V of plaintiffs' amended complaint, but denied their motion as to count II. The estate's motion for a directed finding on count II of defendants' counterclaim was granted with no objection from defense counsel, as no evidence was presented regarding the claim in count II of the counterclaim.

¶ 40　On August 11, 2011, the estate filed a posttrial motion to reconsider the portion of the order entered on July 14, 2011 entering judgment in favor of defendants on count V. The motion was entered and continued.

¶ 41　On February 2, 2012, the court issued an opinion memorandum and judgment in defendants' favor on counts I, III, IV and V. Regarding count I, the court found that the estate failed to establish a claim for breach of contract under the previous buy-sell agreement under the partnership because the partnership was legally converted to an LLC as a matter of law under the Illinois Limited Liability Company Act and the conversion did not fail as the estate argued.

¶ 42    The court entered judgment in favor of the estate and against defendants, however, on count II for declaratory judgment regarding the participation percentages of the members, finding that the January 14, 2004 agreement was enforceable for the year 2004 but did not apply prospectively to 2005 and 2006. The trial court entered judgment in favor of the estate and against defendants on both of defendants' counterclaims. The trial court concluded that under the January 14, 2004 agreement the members had agreed to change the participating percentages for allocating income for 2003 and 2004, but not beyond 2004. The court found that the January 14, 2004 agreement did not mention the years 2005 and 2006. The court awarded the estate $142,967, the amount that was owed to Daniel for 2005 and 2006 under the percentages of the original operating agreement.

¶ 43    Defendants moved for reconsideration, arguing that the members' post-agreement conduct made clear that the changes effected in the January 14, 2004 agreement were permanent and that the members' intent to rectify the imbalances in their capital accounts would not be accomplished if the agreement applied only temporarily for 2004, as determined by the court. The court denied defendants' motion for reconsideration. The court granted the estate's request for prejudgment interest and costs, totaling $36,122.75, but denied the estate an increase in the award in the amount of $101,351.17 with prejudgment interest, for distributions on death representing life insurance proceeds and post-death collections on accounts receivable allegedly owed to Daniel.

¶ 44    On February 8, 2012, defendants filed an emergency motion to modify the judgment and stay enforcement of the judgment pending the filing of a motion to reconsider the issue of the personal liability of individual defendants Ripoli and Grieco. No order was entered on this emergency motion.

¶ 45        Defendants filed a post-trial motion to reconsider on February 28, 2012, arguing that the court's finding on count II that the August 14, 2004 agreement did not effect a permanent change in the participating percentages was against the manifest weight of the evidence and that the monetary judgment awarded was inconsistent with its finding. In the alternative, defendants requested that the court modify the judgment on count II to make it applicable to only the LLC and not against the individual defendants because the individual defendants have no personal liability as members of the LLC by virtue of the Illinois Limited Liability Act.

¶ 46        On July 12, 2012, the trial court entered its final post-judgment order. The trial court granted the estate's post-trial motion to modify the judgment to include pre-judgment interest and costs but denied the motion to modify the judgment to include post-death distributions to Daniel. The trial court denied defendants' motion to reconsider its entry of judgment on count II but granted the motion to reconsider on the issue of Ripoli's and Grieco's personal liability. The judgment was amended to include pre-judgment interest in the amount of $35,741.75 and costs in the amount of $381, for a total monetary judgment of $179,089.75 in favor of the estate against only the LLC defendant.

¶ 47        The LLC appealed, and the estate cross-appealed against the individual defendants Ripoli and Grieco, as well as the LLC. The LLC appealed the trial court's memorandum opinion and judgment entered February 2, 2012 and the court's order of July 12, 2012 denying in part the LLC's motion to reconsider and granting in part the estate's motion to reconsider the court's February 2, 2012 memorandum opinion and judgment. The LLC seeks reversal of the February 2, 2012 memorandum opinion and judgment and the July 12, 2012 order.

¶ 48        The estate's notice of cross-appeal states that the estate cross-appeals the February 2, 2012 memorandum opinion and judgment and also the order of July 12, 2012. The estate seeks

reversal of that portion of the order entered on July 12, 2012 finding that defendants Ripoli and Grieco have no individual liability and the portion of the order denying the estate's post-trial motion to modify the February 2, 2012 judgment to reflect an increase in the amount of the judgment for alleged distributions on death that were owed to Daniel, with prejudgment interest.

¶ 49    The LLC filed an emergency motion to, in part, stay enforcement of the judgment. On August 10, 2012, the court entered an order staying enforcement of the judgment pursuant to Illinois Supreme Court Rule 305 (eff. July 1, 2004). The court entered another order also on August 10, 2012, upon stipulation of the parties, that the money held in trust by the successor trustee under the "Arnold N. Schorn Company Insurance Trust Agreement" shall be held in trust for the benefit of the Daniel estate pursuant to Illinois Supreme Court Rule 305 (eff. July 1, 2004) and will not be distributed until further order or resolution of this appeal in favor of the estate.

¶ 50                                    ANALYSIS

¶ 51                                  I. Jurisdiction

¶ 52    We first address the estate's motion to dismiss defendants' appeal for lack of jurisdiction, which we took with the appeal. In their motion, plaintiffs argue we do not have jurisdiction of this appeal because defendants allegedly did not timely file their notice of appeal. Plaintiffs maintain that the LLC' notice of appeal was not timely, even though they concede it is date-stamped August 2, 2012, within 30 days of July 12, 2012, the date of the court's post-judgment order and memorandum of judgment. Plaintiffs argue that we should not recognize the date stamp on defendants' notice of appeal as the date they filed their appeal because the stamp is a "self service" no-fee filing box stamp and does not bear the date stamp specifically of the civil appeals division of the circuit court of Cook County. Plaintiffs' argument that their belief that the

original notice of appeal was not timely filed is also based on the fact that, as of September 13, 2012, the notice of appeal and the request for preparation of record on appeal were not entered in the electronic chancery docket maintained by the clerk of the circuit court of Cook County.

¶ 53    "The timely filing of a notice of appeal is both jurisdictional and mandatory." *Secura Insurance Co. v. Illinois Farmers Insurance Co*., 232 Ill. 2d 209, 213 (2009). Whether this court has jurisdiction over this appeal is a question of law, subject to *de novo* review. *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 339 (2001).

¶ 54    Under Illinois Supreme Court Rule 303(a)(1), the estate's notice of appeal was required to be filed within 30 days of the court's final post-judgment order disposing of all post-judgment motions, which was entered on July 12, 2002. See Ill. S. Ct. R. 303(a)(1) (eff. May 30, 2008) (notice of appeal must be filed within 30 days after the entry of the order disposing of the last pending postjudgment motion directed against the judgment or order). Thirty days from this order was Saturday, August 11, 2012, which then rendered the deadline for filing a notice of appeal the following Monday, August 13, 2012. See 5 ILCS 70/1.11 (West 2012) (if the last day of a time period within which an act is to be done falls on a Saturday or Sunday, the Saturday or Sunday is not included in the computation).

¶ 55    Illinois Supreme Court Rule 373 provides:

>    "Unless received after the due date, the time of filing records, briefs or other papers required to be filed within a specified time will be the date on which they are actually received by the clerk of the reviewing court. *** This rule also applies to the notice of appeal filed in the trial court." Ill. S. Ct. R. 373 (eff. Dec. 29, 2009).

¶ 56    The estate concedes that "[a]dmittedly, the face of the Notice of Appeal does bear a date-stamp, i.e., '2012 AUG-2 AM 10:50'." The estate argues, however, that a date stamp, absent

actual delivery to and receipt by the clerk of the court, does not constitute a proper filing, citing only to *Roach v. Coastal Gas Station*, 363 Ill. App. 3d 674, 677 (2006). *Roach* does not stand for the proposition the estate claims. In fact, it undermines the estate's argument.

¶ 57     The commonly accepted manner of determining a filing date is by the circuit clerk's file stamp. *Wilkins v. Dellenback*, 149 Ill. App. 3d 549, 553 (1986); *Fairfax Family Fund, Inc. v. Couch*, 103 Ill. App. 3d 492, 494 (1982). Although there is a dearth of precedent directly so holding, the file-stamp date has generally been considered by this court as the time of receipt by the clerk of the court. See *Childs v. Pinnacle Health Care, LLC*, 399 Ill. App. 3d 167, 177-78 (2010) ("Since the notice of appeal reached the circuit court clerk prior to its due date, we consider the date of filing to be the date that it was received by the clerk as evidenced by the file stamp."); *Swinkle v. Illinois Civil Service Comm'n*, 387 Ill. App. 3d 806, 810 (2009) (appeal dismissed for lack of jurisdiction because the notice of appeal was file-stamped in the circuit court more than 30 days after the  final judgment); *People v. Rogers*, 372 Ill. App. 3d 859, 861-62 (2007) (file-stamped copy of late notice of appeal was sufficient evidence that late notice of appeal was properly filed so as to invoke appellate jurisdiction); *People v. Salb*, 224 Ill. App. 3d 610, 612 (1991) (appeal dismissed where the notice of appeal was not filed-stamped until more than 30 days after the judgment). The estate provides no contrary authority for disregarding the file stamp date indicated on the notice of appeal.

¶ 58     The estate argues that the stamp on the notice of appeal should not be considered to have been timely received because the file stamp is a general "self service" filing stamp. The estate concedes that "[t]here is no Rule, General Order, or Administrative Order governing the use of the self service no-fee filing boxes." We find no supreme court rule or precedent holding that

such file stamps are somehow ineffective or are not construed in the same manner as having a court clerk physically file-stamp a notice of appeal.

¶ 59    The estate also argues that the notice of appeal should not be considered to have been timely filed because the file stamp does not indicate it was filed in the appellate division of the circuit court. But Supreme Court Rule 373 merely requires filing with the "clerk of the reviewing court," including for notices of appeal. Ill. S. Ct. R. 373 (eff. Dec. 29, 2009). It does not specify that filing must be specifically within the appellate division of the circuit court for notices of appeal.

¶ 60    The estate provides no evidence that the clerk of the circuit court did not in fact receive the notice of appeal on the date reflected by the file stamp. See *In re C.J.*, 325 Ill. App. 3d 502, 505 (2001) (held there was nothing in record to support the parent's assertion that the date stamped on the notice of appeal was not the actual filing date). We see no reason for any assumption other than the fact that the notice of appeal was received by the circuit court on the date it was stamped. See *People v. Fike*, 117 Ill. 2d 49, 57 (1987) ("Outside of forgery or fraud, we can conceive of no way in which the document could have been stamped August 17 had not the defendant actually tendered the document to the deputy clerk on that date.").

¶ 61    We therefore consider the date indicated by the file stamp on the notice of appeal as the date the notice of appeal was filed. The notice of appeal was filed within 30 days of the court's final post-judgment order disposing of all post-judgment motions and is timely. We have jurisdiction.

¶ 62                                    II. Standard of Review

¶ 63    Before addressing the merits of the appeal, as a preliminary matter the parties dispute which standard of review applies to this appeal. Defendants assert that this case presents purely a

question of contract interpretation, which is reviewed *de novo*. The estate argues that because the trial court heard extrinsic testimony and allowed the introduction of extrinsic documentary evidence, the standard of review should be manifest weight of the evidence.

¶ 64    The manifest weight of the evidence standard applies only if the contract terms are ambiguous and extrinsic evidence is necessary to determine the parties' intent. The parties both cite to *Bradley Real Estate Trust v. Dolan Associates Limited*, 266 Ill. App. 3d 709 (1994). "Where ambiguity exists, the trial court's determination of the intent of the parties must not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Bradley Real Estate Trust*, 266 Ill. App. 3d at 712. Conversely, '[i]f the terms of the alleged contract are unambiguous, then the intent of the parties must be ascertained solely from the words used and is a question of law." *Id.* The interpretation of contracts generally is subject to a *de novo* standard of review and any factual findings that inform the interpretation are given deference on review and are reversed only where they are against the manifest weight of the evidence. *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 74 (citing *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 447 (2009)). Where the trial court has determined the construction of a contract solely as a matter of law, however, this court's standard of review is *de novo*. *Pennsylvania Life Insurance Co. v. Pavlick*, 265 Ill. App. 3d 526, 529 (1994).

¶ 65    Any issue concerning the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law and is subject to *de novo* review on appeal in accordance with the general rules applicable to contract law. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005); *Richard W. McCarthy Trust v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 534-35 (2011). "Since construction of a contract

presents an issue of law in the absence of any material questions of fact, the reviewing court may independently construe the contract [citation] unrestrained by the trial court's judgment [citation]." *Ancraft Products Co. v. Universal Oil Products Co.*, 100 Ill. App. 3d 694, 697-98 (1981).

¶ 66        Although the trial court heard some extrinsic evidence, it relied solely on its interpretation of the January 14, 2004 contract in its opinion and judgment. The court did not refer to any of the extrinsic evidence in its memorandum opinion and judgment concerning count II and the interpretation of the January 14, 2004 contract and its effect on the parties' participating percentages in the LLC. We also note that though the trial court heard extrinsic evidence, that evidence remained undisputed by the estate, and the estate did not include any admissibility of evidence issue in its notice of cross-appeal nor as an argument in its cross-appeal brief. Thus, the facts are not in dispute. We further find that the terms of the January 14, 2004 contract are unambiguous and do not necessitate resort to the extrinsic evidence that was admitted at trial. We therefore apply the *de novo* standard of review.

¶ 67        Also, although the individual defendants and the LLC presented various arguments below, we clarify the limited scope of our review of the LLC's appeal: the judgment in favor of the estate on count II, finding that the members' operating agreement modification in the January 14, 2004 agreement was temporary, and the resulting damages award to the estate.

¶ 68                          III. Merits of the Appeal

¶ 69        Defendants argue that they demonstrated with undisputed evidence at trial that the amendment to Daniel's participating percentage under the operating agreement was permanent, to rectify past imbalances. According to defendants, the trial court incorrectly interpreted the contract because of a "fundamental misunderstanding" about how capital accounts work.

Defendants request us to vacate the judgment in favor of the Daniel estate and instead award them $110,515, the amount allegedly owed by Daniel under the revised agreement. According to defendants, because a capital account is a "running scoreboard," it "makes no sense for the members to have changed their participating percentages only temporarily because doing so would not correct the capital imbalances that had accrued and motivated the changes in the first place." Defendants maintain that under the trial court's interpretation of the agreement, Daniel's "windfall" would be reinstated going forward, which is an "absurd result." Defendants further argue that the conduct of the parties themselves demonstrates that the percentage changes in the January 14, 2004 agreement were intended to be permanent, as Daniel did not at any time object, and Daniel's own memo to Ripoli and Grieco proposed another compensation policy and did not claim an entitlement to the original operating agreement percentages.

¶ 70       The estate, meanwhile, argues in response and in its cross-appeal that Daniel's rights were violated by Ripoli and Grieco, and that their actions were unauthorized and in violation of both the operating agreement and section 15-20 of the Illinois Limited Liability Company Act (805 ILCS 180/15-20 (West 1998)). According to the estate, pursuant to section 20.2 of article XX of the operating agreement, the participating percentage of a member could not be reduced without that member's consent, and Daniel only consented to a reduction of his percentage for the year 2003, in the January 14, 2004 agreement Daniel signed. The estate maintains that Daniel did not consent to a reduction in his participating percentage for the years 2004, 2005, and 2006, but his percentage for these years was nevertheless reduced. The estate thus argues that the damage award to Daniel's estate was proper, as it was based on the amount owed the estate resulting from the unauthorized reduction in Daniel's participating percentage for 2005 and 2006.

¶ 71     The trial court concluded that the January 14, 2004 agreement did not permanently change the members' participating percentages because "nowhere in the document does it make clear that it is intended to apply to future years" and, therefore, it "was not intended to have prospective application." The trial court noted that the January 14, 2004 agreement "identifies particular dates to which it applies, 2003 and 2004 in particular. It quantifies how the capital account balances will be restated as of January 1, 2003, which then appears to be used as a basis to allocate Mr. Daniel[']s income for 2004."

¶ 72     If the terms of a contract are unambiguous, the parties' intent is ascertained solely from the words of the contract itself. *Bradley Real Estate Trust v. Dolan Associates, Ltd*., 266 Ill. App. 3d 709, 712 (1994). "Provisions as to the duration of a contract are to be construed to effectuate the intention of the parties as evidenced by the language employed." *Illinois-American Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1103 (2002). There is no need for a court to resort to rules of construction, where a contract is unambiguous in its expression of duration. *Id*. Thus, we look to the language contained in the contract to determine whether it unambiguously provides for a termination date. "[W]here no termination date is ascertainable from the language itself, courts must look to surrounding circumstances to discover the intention of the parties." *Adkisson v. Ozment*, 55 Ill. App. 3d 108, 112 (1977). "A contract is not ambiguous merely because the parties disagree on its meaning; ambiguity exists where language is obscure in meaning through indefiniteness of expression." *The Reserve at Woodstock, LLC v. City of Woodstock*, 2011 IL App (2d) 100676, ¶ 39.

¶ 73     Factually, the court's finding that the January 14, 2004 agreement was limited in duration and did not effect a permanent change in the parties' participating percentages was against the manifest weight of the evidence and, under our *de novo* review of the contract interpretation, was

legally erroneous. It is undisputed that the contract was silent regarding any limited duration. It simply provided for a change in the participating percentages for the members going forward. The fact that the agreement included a calculation for Daniel's participating percentage for 2004 does not limit the agreement's duration.

¶ 74     The estate argues that Daniel did not consent to a reduction in his participating percentage for the years 2004, 2005, and 2006 under the January 14, 2004 agreement amending the operating agreement, but it is undisputed that Daniel signed the January 14, 2004 agreement. Under the Act, an amendment of an LLC operating agreement requires the consent of all the members (805 ILCS 180/15-5(c)(1) (West 2004)), and here all the members in fact consented. Thus, the January 14, 2004 agreement effectively amended the operating agreement. Indeed, the January 14, 2004 agreement is captioned, "Changes to the Operating Agreement."

¶ 75     The estate also argues that the reduction was an "unauthorized act" because the reduction in Daniel's participating percentage was not "on behalf of the Company" as required under section 15.4 of the operating agreement. But the evidence at trial established that the change was required to keep the LLC from dissolving.

¶ 76     Moreover, the modification of a contract may be ratified by acquiescence in a course of conduct consistent with the existence of that modification. *Corrugated Metals, Inc. v. Industrial Comm'n*, 184 Ill. App. 3d 549, 556 (1989). Daniel's own conduct indicated he acquiesced in the changed percentage and continued to acquiesce and receive reduced distributions until his death in 2004. Daniel's November 11, 2004 memo, written after the agreement, indicates that it was also his understanding that that the January 14, 2004 agreement had permanently changed his participating percentage. In Daniel's memo, although he indicated that he believed the agreement was only to change his percentage for 2003, he also indicated displeasure with the changed

percentage and made yet another proposal as to how to modify his received distributions. Daniel did not claim that he was entitled to his original participating percentage. Daniel continued to receive, and accepted, reduced distributions until his death in July 2006. As Nancy Ciolino, the office manager, testified, Daniel never objected to any distributions he received after January 14, 2004 or to any of the tax returns prepared after that date. There was no evidence that Daniel ever objected to the changed percentages, and Daniel never brought an action for breach of the operating agreement. Instead, Daniel's conduct indicated he acquiesced.

¶ 77     We therefore find that the terms of the January 14, 2004 agreement effectively amended the operating agreement and established a permanent change in Daniel's capital account and participating percentage. The court erred in entering judgment in favor of the estate on count II of its complaint and entering judgment against defendants on their cross-complaint. We thus reverse the judgment and damage award entered in favor of the estate on count II of its complaint.

¶ 78     The LLC requests us to not only vacate the judgment in favor of the Daniel estate but to also enter an award in its favor on its counterclaim for $110,515, the amount allegedly owed by Daniel as the negative balance for his capital account under the revised agreement. The LLC includes only two sentences in its argument in its brief on appeal, and one sentence in its conclusion, stating that the uncontradicted testimony at trial by plaintiff's expert demonstrated that Daniel owed $110,515 to the LLC at the time of his death and that we should therefore enter judgment in favor of the LLC for this amount. The LLC cites to no authority whatsoever in support of this bare contention. "[I]t is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Supreme Court Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on

appeal." *In re Marriage of Johnson*, 2011 IL App (1st) 102826, ¶ 25 (citing *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990)). As the court in *Eckiss v. McVaigh*, 261 Ill. App. 3d 778 (1994), stated, "[i]t is well established that a court of review is entitled to have briefs submitted that are articulate and organized and that present cohesive legal argument in conformity with our supreme court rules." *Eckiss*, 261 Ill. App. 3d at 786 (citing *Schwartz v. Great Central Insurance Co.*, 188 Ill. App. 3d 264, 268 (1989)). "Mere contentions without argument or citation of authority do not merit consideration on appeal [citation], nor do statements unsupported by argument or citation of relevant authority. [Citation.]" *Eckiss*, 261 Ill. App. 3d at 786. " 'Reviewing courts are entitled to have the issues clearly defined [and] to be cited pertinent authorities and are not a depository in which an appellant is to dump the entire matter of pleadings, court action, argument, and research as it were, upon the court.' " *Eckiss*, 261 Ill. App. 3d at 786-87 (quoting *In re Estate of Kunz*, 7 Ill. App. 3d 760, 763 (1972)). The supreme court rules of appellate procedure are not merely suggestions. *Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 928 (1992) (citing *Ryan v. Katz*, 234 Ill. App. 3d 536, 537 (1992)). "The failure to cite authority to support legal arguments violates Supreme Court Rule 341(e)(7) [citation], and results in waiver of the argument." *Weiss*, 238 Ill. App. 3d at 927 (citing *Fitzpatrick v. ACF Properties Group, Inc.*, 231 Ill. App. 3d 690, 708 (1992)). We find that the LLC has entirely waived any argument that it is entitled to damages from the estate and we affirm the entry of judgment against the LLC on both counts of its counterclaim.

¶ 79                                     IV. Merits of the Cross-Appeal

¶ 80        The estate cross-appeals not only the February 2, 2012 memorandum opinion and judgment but also the order of July 12, 2012 denying their post-judgment motion, seeking reversal of those portions of the July 12, 2012 order finding that individual defendants Ripoli and

Grieco have no individual personal liability and denying the estate's post-trial motion to modify the judgment to include Daniel's post-death distributions. We have already addressed the validity of the court's judgment on count II concerning Daniel's participating percentage. We proceed to address the estate's further arguments concerning Ripoli and Grieco's individual liability for breach of the prior partnership buy-sell agreement under count I and the estate's alleged right to further compensation in a distribution on death to Daniel.

¶ 81                                     A.  Ripoli and Grieco Individual Liability

¶ 82        The estate argues that the court erred in determining that Ripoli and Grieco have no individual liability for breach of contract under count I and erred in granting the defendants' post-judgment motion to modify the judgment to reflect entry of judgment against only the LLC and not the individual defendants. It is within the trial court's discretion whether to grant or deny a motion for rehearing, retrial, modification of judgment, to vacate judgment, or for other relief. *Langone v. Schad, Diamond & Shedden, P.C.*, 406 Ill. App. 3d 820, 830 (2010).

¶ 83        The estate first argues that defendants waived this issue by not raising the alleged lack of standing as an affirmative defense in their answer and also by not raising it as an affirmative defense in a motion to dismiss. " '[L]ack of standing in a civil case is an affirmative defense, which will be waived if not raised in a timely fashion in the trial court.' " *Mortgage Electronic Registration Systems, Inc. v. Barnes*, 406 Ill. App. 3d 1, 6 (2010) (quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 508 (1988)). But modifications of judgment within 30 days of judgment in non-jury cases are expressly allowed by section 2-1203 of the Illinois Code of Civil Procedure. 735 ILCS 5/2-1203(a) (West 2012). Defendants, therefore, did timely raise the issue of the estate's lack of standing to sue the individual defendants. They did not waive this issue either below or on appeal.

¶ 84       Motions to modify a judgment are "addressed to the trial court's discretion and its purpose is to alert the court to errors it has committed and to afford the court an opportunity to correct those errors." *Federal Kemper Life Assurance Co. v. Eichwedel*, 266 Ill. App. 3d 88, 98 (1994) (citing *In re Marriage of Sarron*, 247 Ill. App. 3d 819, 823 (1993)). " 'Whether a trial court has abused its discretion turns on whether the court's refusal to vacate "violates the moving party's right to fundamental justice and manifests an improper application of discretion." ' " *Federal Kemper Life Assurance Co.*, 266 Ill. App. 3d at 98-99 (quoting *Mryszuk v. Hoyos*, 228 Ill. App. 3d 860, 863 (1992), quoting *Harris v. Harris*, 45 Ill. App. 3d 820, 821 (1977)). Here, the trial court correctly exercised its discretion in granting the motion to modify the judgment to vacate the judgment against the individual defendants because, by law, they cannot be held liable.

¶ 85       The Limited Liability Company Act was amended, effective January 1, 1998, from previously allowing personal liability of LLC members to the same extent as shareholders in a corporation to expressly barring any personal liability. See Pub. Act 90-424 (eff. Jan. 1, 1998). Under section 10-10(a) of the Act, members of an LLC have no personal liability:

> "(a) Except as otherwise provided in subsection (d) of this Section, the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." 805 ILCS 180/10-10(a) (West 1998).

¶ 86      Section 10-10(a) has remained unchanged since this amendment. 805 ILCS 180/10-10(a) (West 2012). This provision was in effect from the date the partnership was converted to an LLC and has been in effect throughout the duration of this case.

¶ 87      Subsection (d) of section 10-10 provides:

"(d) All or specified members of a limited liability company are liable in their capacity as members for all or specified debts, obligations, or liabilities of the company if:

(1) a provision to that effect is contained in the articles of organization; and

(2) a member so liable has consented in writing to the adoption of the provision or to be bound by the provision." 805 ILCS 180/10-10(d) (West 1998).

¶ 88      The legislature clearly removed the provision that allowed a member or manager of an LLC to be held personally liable similar to the Business Corporation Act. "Thus, the Act does not provide for a member or manager's personal liability to a third party for an LLC's debts and liabilities, and no rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports." *Puleo v. Topel*, 368 Ill. App. 3d 63, 70 (2006) (citing *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994)).

¶ 89      The estate also cannot establish the exception under subsection (d), because there is no provision in the LLC's articles of organization or any other agreement between the members that allows for individual liability of the members to a third party.

¶ 90      In an attempt to avoid the bar of section 10-10, the estate argues that the conversion of the partnership to an LLC "failed" because the LLC members continued to treat certain aspects of the business as a partnership. But the fact that the LLC members continued to treat aspects of

the business as a partnership (for instance, filing K-1 partnership tax return statements) does not change the legal status of the business as an LLC. Section 10-10(c) of the Act specifically provides that any inconsistent actions by LLC members does not affect the legal status of the LLC and cannot be a ground for imposing personal liability:

> "(c) The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company." 805 ILCS 180/10-10(c) (West 1998).

¶ 91    Subsection (c) was added by the 1998 amendment to the Act and has been in effect unchanged since then. See Pub. Act 90-424 (eff. Jan. 1, 1998); 805 ILCS 180/10-10(c) (West 2012). The trial court correctly exercised its discretion in granting defendants' motion to amend the judgment.

¶ 92    The estate maintains that Ripoli and Grieco are individually liable because the conversion from a partnership to an LLC failed. We find the estate's argument on this point is without merit.

¶ 93    On December 31, 1998, Ripoli and Daniel, the only members of the original partnership, filed a statement of conversion and articles of organization with the Illinois Secretary of State. This effectively converted the partnership into a limited liability company. Then Grieco joined the newly formed LLC in 1999.

¶ 94    The statement of conversion specifically stated that "[e]ach partner voted for the conversion," which satisfied the statutory requirement that all partners approve a conversion. 805 ILCS 180/37-10(b) (West 1998). Doing so creates a presumption that all prerequisites to formation have been satisfied. 805 ILCS 180/5-40(a) (West 1998). Under section 5-40 of the Illinois Limited Liability Company Act, "[u]pon the filing of the articles of organization by the

Secretary of State, the limited liability company's existence shall begin." 805 ILCS 180/5-40(a) (West 1998).

¶ 95      The estate also argues that the conversion to an LLC failed because the partnership assets did not vest in the LLC. This argument is entirely refuted by the Act. Under section 37-15(b) of the Act, the entity essentially remains unchanged and "is for all purposes the same entity that existed before the conversion." 805 ILCS 180/37-15(a) (West 1998). The assets do not need to be transferred to vest in the newly formed LLC. Section 37-15 of the Illinois Limited Liability Company Act provides that all assets of the partnership automatically become assets of the LLC upon conversion:

> "(b) When a conversion takes effect:
>
> (1) all property owned by the converting partnership or limited partnership vests in the limited liability company;
>
> (2) all debts, liabilities, and other obligations of the converting partnership or limited partnership continue as obligations of the limited liability company;
>
> (3) an action or proceeding pending by or against the converting partnership or limited partnership may be continued as if the conversion had not occurred;
>
> (4) except as prohibited by other law, all of the rights, privileges, immunities, powers, and purposes of the converting partnership or limited partnership vest in the limited liability company; and
>
> (5) except as otherwise provided in the agreement of conversion under Section 37-10, all of the partners of the converting partnership continue as members of the limited liability company." 805 ILCS 180/37-15(b) (West 1998).

¶ 96       The estate argues that the court incorrectly relied on section 10-10 when section 15-20 of the Act allows actions by a member against other members of an LLC to enforce the member's rights under the operating agreement. Section 15-20 provides, in relevant part:

"(a) A member may maintain an action against a limited liability company or another member for legal or equitable relief, with or without an accounting as to the company's business, to enforce all of the following:

(1) The member's rights under the operating agreement.

(2) The member's rights under this Act.

(3) The rights and otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company." 805 ILCS 180/15-20(a) (West 2012).

¶ 97       Here, however, the claims against the LLC and Ripoli and Grieco were brought by Daniel's estate, not by Daniel. Section 15-20(a) expressly provides only for an action by a "member." It does not also allow for actions by the member's representatives, agents, or a member's estate. The plain language of section 15-20(a) of the Act is expressly limited to only members. In the event of an individual member's death, the member becomes disassociated from the LLC. See 805 ILCS 180/35-45(8)(A) (West 1998). The estate cites to no authority allowing actions against individual members of an LLC by a member's estate. In its cross-appeal, as the appellant on this claim of error the estate must provide this court with authority to support its claim of error, and the failure to do so renders the argument forfeited. See Ill. Sup. Ct. R. 341(e)(7) (eff. Apr. 11, 2001); *Chicagoland Chamber of Commerce v. Pappas*, 378 Ill. App. 3d 334, 364 (2007). The estate has provided no authority that an estate can maintain an action against individual LLC members. As such, the estate has forfeited its argument that it could

properly maintain an action against the individual defendants and obtain a judgment against them.

¶ 98        Under the Act, once the partnership was converted to an LLC with the Illinois Secretary of State, it legally became an LLC and no inconsistent actions of the members can change this legal fact. Once a partnership is converted to an LLC, it legally becomes an LLC and remains an LLC despite any inconsistent actions of its members. Members of an LLC have no individual liability to nonmembers. The Act is clear on both of these points. The court did not abuse its discretion in modifying the judgment on Count II to reflect judgment against only the LLC and not the individual defendants Ripoli and Grieco. We affirm the court's ruling on this issue.

¶ 99                              B.  Post-Death Distributions to Daniel

¶ 100        The estate also argues that the court erred in denying its motion to modify the judgment to include distributions upon death to Daniel, which include $50,000 in life insurance proceeds and the post-death collection of accounts receivable. As noted above, the disposition of a motion to amend a judgment is reviewed for abuse of discretion. See *Federal Kemper Life Assurance Co.*, 266 Ill. App. 3d at 98. We hold the trial court did not abuse its discretion in refusing to award the estate any distributions upon death.

¶ 101        Section 9.5 of the operating agreement provided for distributions upon death, but the addendum to the operating agreement dated October 6, 1999, provided that there would be no distribution upon death unless and until a preexisting loan from American National Bank was paid. The addendum specifically provided: "After each former partner and now member's estate has finally paid its share (50%) of the bank loan, Section 9.5 will apply as to the remaining collections on outstanding receivables at the date of death ***."

¶ 102     The estate argues that defendants waived the issue of this "condition precedent" to the post-death distributions, but this was one of the estate's counterclaims, on which it had the burden of proof. Regardless of whether defendants raised any defense on this issue, the estate had the burden of proof.

¶ 103     The trial court found that the estate did not provide evidence establishing that this loan was repaid. This finding is not against the manifest weight of the evidence. The estate relies on Ryan's testimony that he reduced Daniel's capital account by $1,458, which was half of the balance of the loan. The estate thus interprets the provision in the addendum to mean that once either individual member pays its share (half) of the bank loan, then section 9.5 would apply and allow distributions on death. The addendum, however, requires "each former partner and now member's estate" to pay its share of the loan before section 9.5 would apply. The estate itself argues in its brief on appeal that "[i]t is clear from the language of the Addendum itself that the *requirement that the Note be paid in full* before any distributions on death were made was intended to benefit both Mr. Daniel and Ripoli, upon the death of the first to die." (Emphasis added.) Thus, the estate recognizes that the addendum in fact required that the entire loan be repaid before section 9.5 would apply.

¶ 104     Even assuming as true that Daniel repaid his share of the loan, there was no evidence that Ripoli paid his share of the loan. Further, Ripoli sought reimbursement in the counterclaim from the estate of $1,000, which he, not Daniel, paid for Daniel's share of the loan. Although the estate maintains on appeal that there was "substantial, reliable and uncontroverted evidence" that the loan was repaid, from our review of the evidence at trial, there was no evidence that this loan was in fact repaid. We therefore affirm the portion of the order of July 12, 2012 denying the estate's motion to modify the judgment to include the distribution upon death.

¶ 105                                    CONCLUSION

¶ 106        We hold that we have jurisdiction of this appeal, as we consider the circuit court file stamp as evidence of the date the court received the notice of appeal for purposes of jurisdiction, and the file stamp indicates the notice of appeal was filed within 30 days of the final post-judgment order disposing of all post-judgment motions.

¶ 107        As to the merits of the LLC's appeal, the circuit court erred in determining that the plain language of the LLC members' subsequent agreement effected a change in Daniel's participating percentage in the LLC for only 2003 and 2004 and granting the estate judgment on count II of its complaint. Under our *de novo* review of the trial court's judgment, which was based solely on its interpretation of the contract, the terms are plain and unambiguous and the contract was not limited to only certain years. Instead, the January 14, 2004 effected a permanent change to the operating agreement. We reverse the judgment in favor of the estate on count II of its claim and the award of damages to the estate. But as to the LLC's counterclaim for damages from the estate, we hold that the LLC waived its argument and we affirm the entry of judgment against the LLC on both counts of its counterclaim.

¶ 108        As to the estate's cross-appeal, the conversion to an LLC was effective, as each partner voted for the conversion, articles of organization and a statement of conversion were filed, and the assets of the partnership were automatically transferred to the newly formed LLC. 805 ILCS 180/5-40(a), 37-10, 37-15 (West 1998). Sections 10-10 and 15-20 of the Limited Liability Company Act (805 ILCS 180/10-10, 15-20 (West 1998)) are clear that individual LLC members have no personal liability to anyone other than another LLC member. While the estate argues that defendants waived this argument by not timely raising it below, raising errors in a post-judgment motion is allowed and defendants did timely raise the Act's bar to personal liability in

their post-judgment motion. On the other hand, the estate provides no support for its contention that an estate could bring suit against the individual LLC members, and thus it has forfeited this argument. We affirm these portions of the court's judgment entered on July 12, 2012 finding that defendants Ripoli and Grieco have no individual liability and denying the estate's motion to modify the February 2, 2012 judgment to include distributions on death.

¶ 109    We remand so that the circuit court may enter an appropriate order regarding the money held in trust pursuant to Illinois Supreme Court Rule 305 (eff. July 1, 2004).

¶ 110    Affirmed in part and reversed in part. Cause remanded.